[Civ. No. 22683.   First Dist., Div. Two.   May 12, 1966.]

MARSHALL & COMPANY, INC., Plaintiff and Respondent,
v. HYMAN WEISEL et al., Defendants and Appellants.

Marlais & Hover and Wade H. Hover for Defendants and Appellants.

John N. Pope, Jr., for Plaintiff and Respondent.

AGEE, J.—Defendants Weisel, Lipschutz and Gold appeal from a judgment of $13,000 entered against them in favor of plaintiff, a corporation, following a nonjury trial. On appeal Gold has abandoned any separate defenses, taking the position that if the judgment is valid as against his codefendants it may be deemed to be good as against him.

Respondent is a licensed real estate broker and as such negotiates loans on real estate for a fee. (Bus. & Prof. Code, § 10131.) Detweiler is one of its officers.

In the first part of August 1962, Weisel and Lipschutz, co-partners doing business as "Fontainbleu," were desirous of

obtaining construction financing for a proposed apartment house project.

An appraiser for a savings and loan association offered to help and he took a set of preliminary plans and other data to one Bisnett, a licensed real estate salesman employed by one Alexander, a licensed real estate broker. The plans called for 123 units.

On or about August 15, 1962 Bisnett contacted Detweiler and delivered the plans and other information to him. On August 16, 1962 Detweiler conferred with one Caskey of E. S. Merriman and Sons, a mortgage loan correspondent representing various life insurance companies interested in making large real estate loans. Caskey looked over the plans and expressed interest in the project. Detweiler reported this to Bisnett.

On September 4, 1962, by prearrangement, Detweiler met with Weisel and Lipschutz at their office. Detweiler had prepared and brought with him a printed form of commission agreement. Weisel read it over and stated that it was unsatisfactory. He did not state any specific objection.

Detweiler told Weisel that he would have to have a signed agreement before he would "introduce him to any of our sources." Weisel then said that he would draw up an agreement. Weisel and Lipschutz thereupon went into another office and came back after a time with the typed agreement upon which respondent bases the instant action. All three signed it and then proceeded to Caskey's office in San Francisco.

The agreement provides that if Fontainbleu consummated a "take-out" loan from an insurance company (not named) "which you [Detweiler] or your company [respondent] have caused to come about, that we [Fontainbleu] will pay you 1% commission for your efforts in obtaining said loan."

A three-hour conference was held with Caskey on said September 4, 1962. Caskey had had no prior dealings with Weisel and Lipschutz and he did not know them.

On September 18, 1962 Weisel and Lipschutz signed an application at Caskey's office calling for a loan of $1,235,000. Caskey testified as follows: "Upon execution of the application we called for the normal things including financial statements. When these statements came in, it was determined that the two individuals were not able to show equity capital to cover the difference between the cost of the project and the amount of the loan requested."

Caskey phoned this information to Detweiler and told him

that "everything looked fine except for the financial strength of the applicants." Detweiler immediately called Bisnett and asked if he knew of anyone who could increase the financial strength of the application.

Bisnett contacted appellant Gold and asked him if he was interested in participating in the transaction. He told Gold that "Mr. Detweiler had informed me that he had obtained a tentative commitment for a loan for the project but that the lender felt that Mr. Weisel and Mr. Lipschutz' financial statement was not strong enough to carry the project, and that if they got additional backing, someone to sign with them, that they would make the commitment."

Gold indicated that he might be interested. Bisnett then called Weisel and he agreed to meet with Gold. This led to an agreement between Weisel, Lipschutz and Gold that Gold would have a 15 percent interest in the project and that he would add his personal guarantee to the loan papers.

A second loan application was then filed with Caskey. On December 7, 1962, Caskey's correspondent insurance company, Manufacturer's Life Insurance Company, issued its firm commitment to lend $1,300,000 and appellants accepted the loan. After appellants refused to pay any commission to respondent, this action was filed on May 1, 1963.

Appellants' contentions are based largely upon their interpretation of the facts, contrary to the rule that on appeal the evidence must be viewed in the light most favorable to the respondent.

The agreement of the parties is attacked as being indefinite because the time for respondent's performance is not specified therein.

Where a contract does not specify the time for performance a reasonable time is allowed. (Civ. Code, § 1657.) ▇▇ Here the court found that performance within 120 days was "a reasonable time for plaintiff to perform the loan services required of it by the terms of said written agreement."

A firm loan commitment from the lender was obtained on December 7, 1962. This is 94 days after the signing of the agreement. Caskey, an expert in such matters, testified that a loan broker's services to his client were completed upon the obtaining of a firm loan commitment from a lender able and willing to make the loan and that time limits in such service contracts "vary from thirty to ninety or maybe a hundred and twenty days."

The same witness also testified that the reasonable period of time within which a loan broker can obtain such a loan would

"range from thirty days to ninety to one hundred and twenty days."

Detweiler testified that, just prior to the signing of their agreement, he answered Weisel's question as to how long it would take to obtain the loan by stating that "this type of loan was not a deal that could be put through in a hurry." This prophecy proved to be sound.

■ "The question of what constitutes a reasonable time is always a fact question. [Citations.] In determining what period of time would be reasonable, the situation of the parties, the nature of the transaction, and the facts of the particular case should all be considered." (*Stark* v. *Shaw*, 155 Cal. App.2d 171, 177 [317 P.2d 182].)

■ We think that there is substantial evidence to support the trial court's finding as to what is a reasonable time within which respondent was required to perform its services under the agreement.

■ The next finding attacked by appellants reads as follows: "The take-out loan referred to in said written agreement was and is the sum of $1,300,000.00."

Detweiler testified that the amount of the loan discussed by him, Weisel and Lipschutz at and prior to the time of the signing of the agreement was $1,230,000. When the loan application was made two weeks later, the amount was raised to $1,235,000. When the second loan application was made, on November 20, 1962, the amount was raised to $1,300,000.

Appellants argue that the court's finding that $1,300,000 is the loan amount in reference to which the parties contracted on September 4, 1962, "is obviously a flight of judicial fantasy, as that amount was decided upon only on November 20, 1962, . . ."

The point hardly merits discussion. The clear meaning of the finding is that the loan which was consummated was the *same* loan as that referred to by the parties in their agreement. It negatives the contention that simply because the amount of the loan was larger than originally applied for, it became a *different* loan than that covered by said agreement.

■ When appellants drafted the agreement they did not specify the dollar amount of the loan, describing it only as "a firm take-out, from an Insurance Company, for the above development. . . ." (The development was referred to in the agreement simply as "Fontainbleu Apartments.") We think it is crystal-clear that appellants' description fits the loan obtained.

■ Appellants next attack the finding that no part of the form agreement which Detweiler brought with him when he met with Weisel and Lipschutz at their office on September 4, 1962, was a part of the agreement actually signed by the parties on that date.

Detweiler testified that the unsigned form agreement was filled out in his office *before* he learned from Caskey that the lender would be interested only in a loan on the entire project. Weisel and Lipschutz had planned on a first phase of only 65 units. This is why Detweiler had inserted the lower figure of $650,000 as the amount of the proposed loan.

As we have seen, Detweiler testified that Weisel rejected this agreement without attempting to amend or modify it and proceeded to dictate the agreement which the parties signed. No reference is made in this latter agreement to the one prepared by Detweiler. If Weisel had wanted to incorporate any of its terms he had full opportunity to do so.

It is a familiar rule that "A contract is construed most strongly against the party who drafts or supplies it." (*Warshauer* v. *Bauer Construction Co.*, 179 Cal.App.2d 44, 50 [3 Cal.Rptr. 570]; Civ. Code, § 1654.) It is reasonable to conclude that Weisel put everything which he considered necessary into the agreement which he drafted.

■ The agreement which was signed contains all of the essential elements of a contract, i.e., (1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) a sufficient cause or consideration. (Civ. Code, § 1550.) Its validity does not depend upon or require the incorporation of any of the provisions of the unsigned agreement.

It is apparent that the foregoing attacks on the validity of the September 4, 1962 agreement do not go to the heart of this litigation. ■ As stated in *Bohman* v. *Berg*, 54 Cal.2d 787, 794-795 [8 Cal.Rptr. 441, 356 P.2d 185]: "It is well-settled law that, although an agreement may be indefinite or uncertain in its inception, subsequent performance by the parties under the agreement will cure this defect and render it enforceable. When one party performs under the contract and the other party accepts his performance without objection it is assumed that this was the performance contemplated by the agreement."

### Procuring Cause.

■ Appellants obtained the loan they wanted. The crucial issue in this case is whether there is substantial evidence to support the implied finding of the trial court that such loan

was one which, in the wording of the agreement, respondent "caused to come about."

The answer to us seems clear. Detweiler took Weisel and Lipschutz to Caskey of E. S. Merriman and Sons, with whom he had had previous transactions of a similar nature and with whom he had already conferred with respect to this transaction. Weisel and Lipschutz did not know Caskey and he did not know them.

We thus have the inception of a willing lender and willing borrower relationship. The loan application was then prepared and presented on September 18, 1962, only two weeks later. Caskey testified that, after a thorough investigation of the project, he was willing to recommend the application except for *one* thing, that Weisel and Lipschutz did not have sufficient personal assets to insure the completion of the construction.

Hence, the way was open for the granting of the loan *if* this insufficiency could be supplied. This was accomplished by the finding of Gold and his entry into the venture.

The chain of events leading up to the granting of the second loan application has been related above. Simply stated, these events are that Detweiler's call to Bisnett caused Bisnett to contact Gold, whose offer to personally guarantee the loan satisfied Caskey and resulted in his recommending to his client that it make the loan.

Thus, the evidence amply demonstrates that respondent (per Detweiler and Bisnett) brought into the transaction a party (Gold) who was ready, able and willing to, and who did in fact, make possible the obtaining of the required loan on terms mutually acceptable to all parties concerned.

Appellants contend that they are not liable for Bisnett's services because they did not have any agreement with him or his broker-employer to pay a commission and respondent was not authorized to make one for them.

This contention misses the point. Bisnett and Alexander do not contend that they have any commission agreement with appellants nor do they make any claim against them. The only commission which appellants are being asked to pay is the commission due under the agreement of September 4, 1962.

The agreement which Bisnett and Alexander have is with *respondent*, under which they are to receive from respondent a share of the commission.

It may be noted that appellants' agreement does not limit the services to be performed thereunder to those of Detweiler

personally. It provides for payment of a commission on a loan "which you [Detweiler] *or your company* have caused to come about, . . ." (Italics added.) This obviously contemplates the use of services of others.

The trial court clearly understood the position of Bisnett and Alexander. It expressly found that they acted as agents of *respondent* "for the purpose of procuring said take-out loan."

Appellants never made any objection to Bisnett's participation in the transaction or his efforts to consummate a loan. As he testified: "I first made Mr. Weisel aware of the fact that I was participating in the commission when I called him in regard to setting up an appointment with Mr. Gold to see if we could get Mr. Gold to go in on the deal with him."

We have concluded that respondent fully performed the services required of it under the agreement with appellants. While appellants stress the fact that such services consisted of little more than introducing them to E. S. Merriman and Sons and to Gold, there is more to it than that.

Respondent had built up a relationship with Merriman through past transactions and knew how best to present a loan application of the type involved herein.

Bisnett and Alexander were known to Gold through past transactions and he had confidence in their judgment. It meant something to him when Bisnett recommended the within project.

The importance of services which result in the bringing together of the principals in a transaction which is thereafter consummated has frequently been discussed by the courts. (Cf. *Richardson* v. *Walter Land Co.,* 118 Cal.App.2d 459, 463 [258 P.2d 42] ; *Pryor* v. *McGuire,* 59 Cal.App. 234, 238-239 [210 P. 532] ; *Oaks* v. *Brahs,* 132 Cal.App.2d 182, 184 [281 P.2d 562] ; *Williams* v. *Kinsey,* 74 Cal.App.2d 583, 593 [169 P.2d 487].)

Judgment affirmed.

Shoemaker, P. J., and Taylor, J., concurred.