[Civ. No. 911.   Fifth Dist.   Apr. 29, 1968.]

CITY OF STOCKTON, Plaintiff and Respondent, v. STOCK-
TON PLAZA CORPORATION, Defendant and Appel-
lant.

Fitzgerald & Von der Mehden, John D. Fitzgerald and Robert E. Zang for Defendant and Appellant.

Monroe N. Langdon, City Attorney, Daley, Patridge & Garrett, Daley, Brewer, Patridge & Garrett and Richard B. Daley for Plaintiff and Respondent.

STONE, J.—The City of Stockton leased land adjacent to a redevelopment area to appellant, by which the lessee agreed, subject to certain conditions, to construct improvements upon the leased land, including a convention center and a motorhotel. For many months following execution of the lease, appellant was unsuccessful in obtaining financing necessary to carry out the terms of the lease.

The city brought this action against appellant-lessee, alleging three causes of action: to terminate the lease for failure to perform, for declaratory relief, and to quiet title, basing each cause of action upon appellant's failure to obtain financing and proceed with the redevelopment construction project.

Appellant answered, and filed a cross-complaint. Appellant's case rests mainly upon its contention that under the terms of the lease all construction and redevelopment is contingent upon its obtaining financing as described in the lease and, since no time is specified, appellant had an indefi-

nite period, dependent only upon its good faith and its solvency, to obtain adequate financing.

The agreement in regard to the critical issue of financing is largely found in a single paragraph of the lease, No. 29, and the matrix of the case lies in the trial court's interpretation of that part of the paragraph reading:

"*Lessee's Mortgage Financing*: It is agreed and understood that all of the obligations of Lessee as prescribed herein are subject to the availability to Lessee of acceptable first mortgage financing for the construction of the structures, facilities and improvements as agreed upon herein. For the purpose of this Lease acceptable first mortgage money shall mean a loan with interest rate of a maximum of seven per cent (7%) for seventeen (17) years and for a minimum of sixty per cent (60%) of the value of the improvements. In the event evidence is submitted to Lessor illustrating that such acceptable first mortgage financing shall not be available to Lessee within one (1) year from the date of the commencement of this Lease, Lessee shall have the right to terminate this Lease."

Patently, the foregoing language places no burden on appellant to obtain "first mortgage financing" within a specified time. It merely gives appellant, as lessee, the right to terminate the lease by submitting evidence to the lessor "illustrating that such acceptable first mortgage financing shall not be available to the lessee within one year from the date of the commencement of this lease." Nothing is said about the lessor's right to terminate, so the question left in mid-air by paragraph 29 is what happens if the lessee neither obtains financing within one year nor elects to terminate the lease? Does the lessee have the right to keep the lease alive indefinitely, as appellant contends, by simply continuing in good faith to try to obtain "acceptable first mortgage financing?"

The trial court determined that in the absence of agreement, performance is governed by Civil Code section 1657 which, in pertinent part, provides: "If no time is specified for the performance of an act required to be performed, a reasonable time is allowed."

Whether the trial judge was correct in this is the basic question in the case.

■ Before going to the substantive issue, that is, the interpretation of paragraph 29, we consider a subsidiary evidentiary question, whether the court erred in not admitting five prior drafts of the lease to show that as originally drawn

paragraph 29 gave the lessor as well as the lessee the right to cancel at the end of one year if lessee was unable to obtain first mortgage financing. Certainly the prior drafts were not admissible to vary or contradict the terms of the final agreement. From their very nature the drafts were not contemporaneous agreements (*Masterson* v. *Sine,* 68 Cal.2d 222, 224-231 [65 Cal.Rptr. 545, 436 P.2d 561]); they were superseded by the final integrated lease. (Rest., Contracts, § 237, com. a.)

Appellant argues that the prior drafts were offered, not to vary or contradict the terms of the lease, but to prove that the omission of the lessor's right under paragraph 29 to terminate the lease at the end of one year was intentional. We believe the documents were admissible for that purpose. We learn from 3 Corbin on Contracts, section 579, pages 412-413, that: ''The 'parol evidence rule' is not, and does not purport to be, a rule of interpretation or a rule as to the admission of evidence for the purpose of interpretation. Even if a written document has been assented to as the complete and accurate integration of the terms of a contract, it must still be interpreted; and all those factors that are of assistance in this process may be proved by oral testimony.'' (See also *Anchor Cas. Co.* v. *Surety Bond Sav. & Loan Assn.,* 204 Cal.App.2d 175, 183 [22 Cal.Rptr. 278]; Witkin, Cal. Evidence (2d ed.) p. 670.)

No harm resulted from the refusal to admit the drafts in evidence, for two reasons. First, counsel for both parties said at the trial and also in this court that the language is clear and unambiguous; no contention is made that the wording of paragraph 29 is the result of mistake or inadvertence. Thus, the court was duty bound to accept and apparently did accept the language of paragraph 29 at its face value, as the intentional act of the parties. The prior drafts could serve no purpose other than to prove a fact that is not in dispute. Second, and most significant, the former city manager, who acted on behalf of the city in the negotiations leading up to the lease, was cross-examined fully on these matters by appellant, so the court had before it not only complete information concerning the preliminary drafts of paragraph 29 but testimony concerning the surrounding circumstances which the silent drafts could not impart. We find no prejudicial error, even though we conclude the evidence should have been admitted for the purpose for which it was offered.

We return to the vexing question whether the trial court was justified in finding as an implied condition in para-

graph 29 an obligation upon appellant to obtain financing within a reasonable time, bearing in mind that this threshold requirement was the *sine qua non* for performance of the lease. Appellant asserts that obtaining suitable financing is a condition precedent to the performance of all other provisions of the lease, not a covenant to be performed. Therefore, it is argued, until the condition precedent is satisfied the lessee is under no duty to perform and Civil Code section 1657 does not apply.

Whether paragraph 29 constitutes a condition precedent or a covenant does not appear to be determinative because as a condition precedent it bears the characteristics of an option without a time limit. In such cases the law implies a reasonable time within which the option must be exercised. So, here, by parallel reasoning, if paragraph 29 is a condition precedent it must be performed within a reasonable time. (1 Witkin, Summary Cal. Law (1960) Contracts, § 53 par. (b), p. 61.) If it is a covenant, performance cannot be delayed indefinitely in the face of Civil Code section 1657. (*Marshall & Co.* v. *Weisel*, 242 Cal.App.2d 191 [51 Cal.Rptr. 183].) Thus under either theory, whether paragraph 29 be viewed as a condition precedent or a covenant, the question of interpretation is the same.

Before this court can reverse the finding that "a reasonable time for performance" is an implied term or condition of paragraph 29, we must determine that the trial court's interpretation is erroneous. (*Parsons* v. *Bristol Dev. Co.*, 62 Cal.2d 861, 866 [44 Cal.Rptr. 767, 402 P.2d 839].) In approaching this question, we must view the contract in the light of all the surrounding circumstances as reflected by the evidence. The controlling principle is stated in *Anchor Cas. Co.* v. *Surety Bond Sav. & Loan Assn., supra*, 204 Cal.App.2d at page 183, as follows: "In interpreting the language of the contract the court should seek to determine the intention of the parties and to arrive at a reasonable interpretation thereof. [Citations.] The court may also look to surrounding circumstances in order to decide what is reasonable and what the parties intended by the language used. [Citations.] Both prior negotiations and prior conversations may be construed as well as the subsequent acts of the parties in ascertaining the true intention of the parties to the contract."

The trial court had before it the fact that both parties were aware during all of the negotiations that the city's purpose in entering into a lease was to implement a redevelopment project that had been commenced in the heart of the City of

Stockton. The object, as lessee well knew, was to revitalize the area, replace dilapidated buildings and facilities with modern and attractive structures and, particularly, to provide the City of Stockton with a convention center and nearby motel and hotel accommodations. Furthermore, the lease project was a part of an over-all development plan designed to complement an adjoining revitalized area surrounding a new county courthouse. The impact of these facts is pointed up by the general principle of contract interpretation, phrased thus in 12 Cal.Jur.2d, Contracts, section 154, page 369: ''The object to be attained is the principal factor for consideration in the construction of contracts. In interpreting a contract a court's most important duty, therefore, is to discover the true meaning of the instrument and to glean therefrom its purposes and objects. Words, phrases, and sentences are construed in contemplation of these purposes and objects. Contracts entered into for the mutual material benefit of the parties are to be so construed as not to defeat these objects when such construction is reasonably deducible from the terms.''

Civil Code section 1647 provides: ''A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates.''

Section 1650 provides that ''particular clauses of a contract are subordinate to its general intent.''

At oral argument appellant conceded that it would be unrealistic to contend that the property would have to stand idle and unimproved indefinitely, that is, until the lessee either obtained the elusive first mortgage financing or elected to abandon the lease. When asked why under such circumstances a reasonable time was not properly implied, counsel answered that the term ''reasonable'' is ''too amorphous,'' countering that the time for performance should remain open so long as appellant acted in good faith and was not insolvent.

Concededly, the term ''reasonable time'' is less certain than many legal standards applied in our law; on the other hand, it is not at all uncommon for the law to prescribe an abstract criterion which as an isolated concept is general or indefinite but which gains point and precision from the facts peculiar to a particular case. For example, the juridical criterion ''substantial evidence'' offers, by parallel, an abstract concept which the courts have been able to apply to particular cases. What appellant sees as amorphous in the term ''reasonable time'' we view as ''flexibility'' empowering the courts to do justice according to the circumstances of each individual

case. Moreover, the Legislature does not deem ''reasonable time'' an amorphous criterion; at least it has found it substantial enough to incorporate the test in Civil Code section 1657. Nor have the courts of California encountered insurmountable difficulties in applying the test to facts of widely differing cases.

Thus, upon analysis, appellant's posture in the case is not really whether the trial court was justified in implying some limitation upon appellant's right to ''tie up'' the property under the lease, but whether the limitation should be a reasonable time, as the court found, or so long as appellant is acting in good faith and is not insolvent, as appellant suggests.

Appellant argues that the chief question is whether the city shall be held to the same standard as a private person in the performance of its contract. Manifestly, the case does not turn on this rhetorical question. Civil Code section 1635 directs that ''All contracts, whether public or private, are to be interpreted by the same rules, except as otherwise provided by this code.'' We find no exception applicable here. But a word of comment is called for because appellant's involvement with the city is a circumstance relevant to the implication of a reasonable time for performance. To begin with, a general answer will not suffice since contracts between private citizens and public entities are much too diverse for the application of rigidly drawn and universally applied guidelines. While it is true the courts have properly held public entities to their contracts, peculiarities of fact cannot be ignored, and such a circumstance here is that the contract involves an unusual public purpose, as we have noted above.

In the absence of any specified time for performance under paragraph 29, we conclude the court properly applied the ''reasonable time'' standard devised by the Legislature to meet such situations.

We come to the question whether, in light of the facts, the trial court's finding that appellant failed to perform within a reasonable time is supported by the evidence.

Reasonableness, when related to timeliness, is necessarily a question of fact, and therefore must be resolved according to the circumstances of the particular case. (*Maas* v. *Standard Oil Co.*, 220 Cal.App.2d 913, 916 [34 Cal.Rptr. 278]; *Hoppin* v. *Munsey*, 185 Cal. 678, 684 [198 P. 398]; *C. A. Hooper & Co.* v. *Freeman-Smith-Camp Co.*, 1 Cal.App.2d 122, 124 [36 P.2d 146].)

The lease provided that subject to the provisions of

paragraph 29 (availability to lessee of acceptable first mortgage financing) upon approval of plans and specifications: "Lessee shall in good faith immediately commence construction of the garden type motor-hotel and the other facilities mentioned in Paragraph 5 hereof and prosecute the same to completion with all due diligence within eighteen (18) months after said plans and specifications have been approved by City Manager, . . ." The final plans were submitted to the city on October 26, 1962, and were approved January 15, 1963. Construction was not commenced, however, because appellant was unable to obtain first mortgage financing. By July 31, 1963, Mr. Flowers, vice president of appellant, had attempted to obtain financing from 17 insurance companies, 8 banks, 15 savings and loan associations, 17 mortgage brokers, and 2 commercial financing companies. In testifying about his efforts to obtain the financing, Mr. Flowers stated:

"We had not applied to all the lending institutions who could conceivably have been interested in conventional financing, but we'd had certainly by June of 1963, we were discouraged, we thought we might have to wait a long time before we would finally find something with the conditions of the mortgage money market might improve or until the Savings & Loan Associations had a larger portion of their portfolio, uncommitted portfolio, which they could put in commercials, . . ."

The principal difficulty, he said, lay in the fact appellant as a lessee did not own the land in fee. He advised the city manager of this difficulty on February 28, 1963, and proposed that appellant be permitted to purchase the property at a price of $600,000. The city declined to sell. On July 19, 1963, Mr. Flowers, by letter to the city manager, asked the city to subordinate its fee title to leasehold financing, stating: "our request for subordination is an indication that conventional financing does not appear to be available without such subordination." The city declined to subordinate its property to provide security for a loan to appellant.

On August 26, 1963, Mr. Flowers, on behalf of appellant, addressed a letter to the mayor and the city council, suggesting the formation of a nonprofit, quasi-municipal corporation for the purpose of developing all of the public use facilities of the proposed convention center, to be financed by the sale of tax-exempt bonds. Appellant, in turn, would lease from the nonprofit corporation and finance the construction of the commercial facilities with conventional financing. The city

tentatively approved the plan, at least in principle, and appellant thereafter obtained a written commitment from Schwabacher & Co. dated February 11, 1964, to place bonds and notes on the market at the lowest interest rates obtainable or to underwrite bonds to be issued in connection with the construction of public facilities. The city council approved the Schwabacher plan of financing on March 9, 1964, contingent upon a change in the original lease term providing for payment of debt service prior to payment of ground rent. On March 13, 1964, Mr. Flowers wrote to the city manager:

"We are unable to proceed further until we have a decision by the City of Stockton relating to the split on the proposed bond financing."

The city then countered with an alternate plan to sell the property to a responsible buyer under an agreement that would require the construction of improvements in accordance with the development plans, the property to revert to the city upon the expiration of 50 years. At a council meeting June 10, 1964, Mr. Flowers discussed the problems of nonprofit corporation bond financing and the alternate plan. By a 5 to 4 vote, the council determined to take the alternate plan under consideration. Appellant was notified that the price would be $600,000 and requested to indicate acceptance or rejection at the July 20 council meeting.

At the July 20 meeting, Mr. Flowers stated that appellant would accept the proposal, but pointed out there would be some difficulty in financing because the $600,000 purchase price added that much more to the cost of the entire project to the lessee. He stated that 120 days would be "the absolute optimum time if nobody turns this down," but as a practical matter financing would take six months and maybe a year. He argued again for the nonprofit corporation method of financing, which the city again rejected. Appellant was given until July 23 at 5 p.m. to accept or reject, in writing, the city's offer to sell the property for $600,000 with title to revert to the city in 50 years. By letter dated July 22, appellant accepted the proposal and suggested that the existing lease be amended accordingly.

At the council meeting held August 17, 1964, Mr. Flowers was informed that an agreement modifying the original lease would be prepared, that appellant would have 120 days after the date of execution of that document within which to deposit $600,000 in cash, otherwise the original lease would be terminated. The city's written amendment contained a new provision, designated paragraph 45, which provided that in

the event appellant failed to exercise the option and comply with its terms, the lease would terminate.

Mr. Flowers appeared before the council on August 24 and protested the addition of paragraph 45. He gave a resume of appellant's activities and efforts since execution of the original lease, pointed out the delay on the part of the city in approving plans, and advised the council that appellant *stood on the original lease* and would not agree to its termination in the event it was unable to exercise the option to purchase. As to the difficulty in obtaining conventional mortgage loan financing, he stated:

"Between January—from the middle of January, 1963, until the middle of July 1963, I made considerable effort, including a trip to the east, and several trips to Los Angeles, talking to a number of people about this financing. We never gave up completely but it became quite apparent that because of the lease-hold that we may never get financing this way."

The council voted to retain paragraph 45 in the amendment, and appellant refused to sign the modified lease.

On September 14 and again on November 25, the city attorney, by letter, advised appellant that it would have 120 days from September 11, or until January 9, 1965, within which to exercise the option. In the last letter the city added that unless appellant exercised the option before January 9, "the City will seek other developers to construct the facilities."

On January 11, 1965, Mr. Flowers appeared at the council meeting and acknowledged that he had neither a check for $600,000 nor a financing commitment in writing. He stated that he had an oral telephonic commitment from a Mr. Rafferty and could have a written commitment within one week for $2,700,000 financing from Schwabacher & Company, which would require the formation of a nonprofit corporation, a ruling of the Internal Revenue Service as to the tax-exempt status of bonds to be issued, and a letter from the Securities Exchange Commission authorizing a sale to the public in the event the bonds were not privately placed. The proposed financing arrangement would exclude construction of the proposed shopping plaza and a service station. As to these commercial facilities, Mr. Flowers asked for a one-year option to purchase that portion of the property and obtain conventional financing. The council declined to consider any new proposals, and voted to terminate the original lease. It instructed the city attorney to give formal notice to appellant of such termination.

From the time Mr. Flowers advised the city manager by

letter on July 19, 1963, that "conventional financing does not appear to be available without such subordination," until January 11, 1965, appellant attempted to change or modify the lease in the various ways outlined above. No successful renegotiation was achieved.

We cannot say that the trial court erred in finding that appellant failed to perform the provisions of the lease within a reasonable time in view of the fact that appellant had not obtained "conventional financing" pursuant to paragraph 29 for a period of 40 months from the date of the execution of the lease, August 28, 1961, and for a period of two years from the approval of the plans and specifications on January 15, 1963.

The trial judge fortified his decision that paragraph 29 did not extend appellant's time to perform the lease indefinitely, by reference to other provisions of the lease. This procedure was in accordance with Civil Code section 1641, which provides: "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."

Specifically, the court said, in a memorandum opinion:

"The lease calls for certain and timely action on behalf of Stockton Plaza in at least two respects, namely, the preparation and submission of plans and specifications within ten months after date of the execution of the lease (Paragraph 7 and Amendment to the Lease) and the commencement of the construction of the hotel and convention facilities *immediately* after the approval of said plans and specifications, to be completed within eighteen months thereafter (Paragraph 8).

"Stockton Plaza complied with the provisions of paragraph 7 of the lease and the amendment extending time, by the submission of its plans and specifications to the City Manager in the fall of 1962. The plans and specifications prepared and submitted by Stockton Plaza were approved, and it was notified of such approval in January of 1963. It did not comply with provisions of the lease which required the immediate commencement of construction and its completion within eighteen months.

"Though the non-performance by Stockton Plaza resulted from its failure to secure financing, as opposed to a wilful refusal on its part to perform, there can be no quarrel with the proposition that the principal object of the lease, the prompt construction of a first rate, downtown hotel and convention center facilities, was thwarted by its inabilities. It argues, however, that its thorough (but not productive) efforts to secure financing is all that is required of it because

of the language of Paragraph 29 of the lease. In substance this provides that the lessee's obligations under the lease may be excused if it fails to secure conventional first mortgage financing within one year, and it notifies lessor to this effect. The Court concludes that Paragraph 29 does not expressly, or otherwise, grant to Stockton Plaza any extension of time for its performance as required by Paragraph 8 of the lease.

"In Paragraph 8 it is provided that the obligation of lessee to commence and complete construction is made subject to the provisions of Paragraph 29. But it is also stated therein that *those delays which shall extend time* shall be those which are due to fire, earthquake, etc., and any intervening cause beyond the control of lessee. The lack of, or the failure to obtain, financing is omitted as a specific cause for delay. This, to the Court, is a clear indication that such was not to extend time for commencement of construction, and that such is not the function of Paragraph 29.''

Appellant makes a number of collateral points, one being that because the city negotiated with appellant as to various alternative methods of proceeding with the project it should be estopped from implying a reasonable time limit in paragraph 29. The significant contractual aspect of each proposed modification submitted to the city by appellant is that the city was asked to give up a valuable property right, and in each instance it elected not to do so. For example, appellant suggested at one time that the city sell the property to it, at another time that the city subordinate its lessor's rights to a lending institution, and again that the city authorize a nonprofit public corporation to sell bonds; none of which was in accord with the terms of the lease. In considering these alternatives to the lease, the city made no waiver expressly or impliedly of the requirements of paragraph 29 or of any other provisions of the lease. Moreover, neither fraud nor misrepresentation that would serve as the framework for an estoppel was pleaded or proved.

Alternative plans were advanced on appellant's behalf only after Mr. Flowers advised the city there was little hope that appellant could obtain conventional financing. Certainly the city did not mislead appellant or in any way interfere with appellant's continued efforts to obtain first mortgage financing.

■ Appellant makes the additional contention the city breached the agreement by not complying with a provision requiring it to apply to the Small Craft Harbors Commission of the State of California for a loan to be used for develop-

ment of a marina. The provision, which is paragraph 6 of the lease, reads as follows:

"Lessor agrees to use its best efforts to request an appropriation by the Legislature of the State of California for additional funds for the development of small craft harbors, and will request a construction loan from the Small Craft Harbors Commission for the construction of all of the marina facilities proposed in the comprehensive marina plan. . . ."

This was an independent covenant by the city to use its best efforts to request an appropriation by the Legislature of the State of California for the development of a small crafts harbor. As to this issue, the trial court found:

"The plaintiff never did file an application for a construction loan from the Small Craft Harbors Commission of the State of California for the construction of the marina facilities proposed in its marina plan. Had such an application been filed, such funds could not have been available for use until at least 1965, and would have been available too late to have any effect upon the defendant's ability to obtain financing for its construction."

In reviewing the record pertinent to the foregoing finding of fact to determine whether there is substantial evidence to support it, the following is reflected:

Dr. Edmond P. Halley, produced by respondent, testified that he was a member of the Small Craft Harbors Commission of the State of California; that the commission had overcommitted its resources and up until July 1963 there were no funds available even had application for a loan been made and the commission approved it; that had an application been filed in late 1963 no funds would have been available until the 1965-1966 budget, and then only subject to legislative approval.

Mr. William Carlile, Deputy City Manager for the City of Stockton, testified at some length about the efforts made in regard to obtaining a loan for marina construction, such as contacts had with the commission and the exchange of correspondence. With respect to the availability of funds for loan purposes, he testified as follows:

"Q. All right. That takes us into '63. On January 10 of 1963 did you have a discussion with Mr. Flowers about the availability of funds through the Small Craft Harbors Commission?

"A. Yes.

"Q. Can you tell us what was said in this conversation between the two of you?

"A. On January 10, 1963, we had present at the meeting Mr. Tom Flowers, Mr. Roger Huckins, Mr. Elmer Boss, Mr. Frank Fargo, Mr. Vance Wilson and myself, and at that time the matter of the construction loan from the Small Craft Harbors Commission was brought up. We stated that we still could not make application due to the fact that funds were not available from the Small Craft Harbors. Mr. Flowers at that time said well, to obtain the construction loan from the Small Craft Harbors at this time is too late for this project. That is primarily the—

"Q. The substance of that conversation?

"A. Yes."

The foregoing testimony was contradicted, to a certain extent, by Mr. Robert Lee Ramsey, called as a witness by appellant. He testified that he was employed by the City of Stockton to make an exploratory study of the marina development and of the status of the Small Craft Harbors Commission and the availability of loans. Although he testified that funds were available for loans and that there were two sources of funds, appropriations from the Legislature and repayment of previous loans, he could not specify exactly where the commission's financing came from, or where the funds would come from, or whether any were available for a Stockton marina project.

The testimony of Mr. Ramsey merely created a conflict with the testimony of Dr. Halley, a member of the Small Craft Harbors Commission of the State of California, and of Mr. Carlile, Deputy City Manager for the City of Stockton, who carried on negotiations with the commission concerning a loan. Here, the rule that a reviewing court will not weigh contradictory evidence nor pass upon the credibility of witnesses is peculiarly applicable. (*Kyle* v. *Stone,* 234 Cal.App. 2d 286, 291 [44 Cal.Rptr. 390]; *Hicks* v. *Reis,* 21 Cal.2d 654, 659 [134 P.2d 788]; *Blank* v. *Coffin,* 20 Cal.2d 457, 461 [126 P.2d 868]; *Bruce* v. *Ullery,* 58 Cal.2d 702, 710-711 [25 Cal. Rptr. 841, 375 P.2d 833].)

There remains appellant's contention that the city failed to give either the notice required by the lease or statutory notice of termination of the lease. Paragraph 25 gives the city the right to terminate upon default in payment of rent or in any of the terms, agreements, conditions or covenants of the lease, or in the event of abandonment of the premises by the lessee. It also provides:

"No default shall be declared by Lessor as to any breach

which may be cured or obviated by Lessee until the expiration of thirty (30) days after written notice by City Manager to Lessee . . . , of such default and if, during such thirty (30) day period, such default shall not have been cured or obviated by Lessee or said lender; . . ."

The trial court found:

"XII. The default of the defendant in failing to obtain financing and in failing to commence construction was not such a default as could be cured or obviated by the defendant within thirty days after notice by the plaintiff.

"XV. After the adoption of the resolution of the City Council of January 11, 1965, a certified copy of such resolution was forwarded to the defendant by the City Clerk. Neither prior to the adoption of such resolution and the purported termination of the said lease, nor at any time thereafter, did the City Manager of the City of Stockton serve upon the defendant a written notice of default in the form required by Paragraphs 25 and 37 of the said lease agreement. At no time before or after the adoption of such resolution did the City Council by resolution before declaring a default give to the defendant the right to cure or obviate the alleged act of default within thirty days from the date of a written notice served by the City Manager."

The court also found the defendant was evicted during the month of March 1965, and that:

"XVI. . . . Prior to the eviction of the defendant from Weber Point the plaintiff did not serve upon the defendant a statutory notice to quit."

From the findings of fact, the court concluded:

"Neither a three day nor a thirty day notice of termination was required to be given by the plaintiff to the defendant. The various written and oral notices given by the plaintiff to the defendant between September 1963 and the resolution of termination were adequate notices of the plaintiff's intention to terminate the lease for non-performance, should such notice be required."

The city relies upon the fact that it gave actual notice that the lease terms had been breached to appellant, and that it had 120 days to remedy the default. Numerous instances are cited of actual notice given to Mr. Flowers, vice president who acted for appellant throughout. In a letter dated August 3, 1964, the city council gave appellant notice it had 120 days within which to obtain financing. Mr. Flowers was present at a meeting July 24, 1964, and stated to the city council:

"It's abundantly clear to us that the majority of the mem-

bers of the Council, if not all of them, intend to cancel this lease after 120 days if we do not finance it. And there is no reason at all why you could not separately pass a resolution even tonight, stating that the lease is cancelled at that time.''

Mr. Flowers admitted at the trial that he knew in July the lease would be terminated within 120 days, and that he so stated at the July 24 council meeting. He also admitted that he received letters from the city attorney under dates of August 27, September 14 and November 25, 1964, notifying him that appellant must obtain financing within 120 days from August 23, 1964.

Additionally, the city gave appellant actual notice by mailing a copy of the city council's resolution of January 28, 1964, to Mr. Flowers. This resolution, which was never abandoned nor waived, gave notice in certain and unambiguous language that appellant had 120 days to perform. It constituted not 30, but 120 days' notice.

The city also points out that the lease did not specify any particular form of notice of default or to perform, so that actual notice suffices. ▮▮▮ Furthermore, the law does not require meaningless or idle acts. (Civ. Code, § 3532.) City argues that courts have gone so far as to dispense with the requirement of written notice completely where the party had actual notice. (*Wall* v. *Heald,* 95 Cal. 364 [30 P. 551] ; *Bell* v. *Thompson,* 8 Cal.App. 483 [97 P. 158] ; *Sawyer* v. *Sterling Realty Co.,* 41 Cal.App.2d 715, 720-721 [107 P.2d 449].)

▮▮▮ In any event, it is clear under the facts of this case that additional notices would have been surplusage, serving no particular purpose, because they would not have given appellant any better notice than it received by those actually given.

City also argues that the lease requires a written notice of default only in cases where the breach could be remedied within 30 days; while, here, defendant could not have obtained any form of financing within 30 days that would have enabled it to meet the terms of the lease.

Four methods of financing under the original lease were brought out by the evidence: (1) an increase in equity capital, (2) short term borrowing, (3) a standby takeout loan, or (4) conventional mortgage financing. The record reflects that to obtain an increase in equity capital would take at least 120 days, a short term loan would take a minimum of 60 to 90 days after application, a standby takeout loan would take 120 to 180 days to place, and appellant had been unable to obtain conventional mortgage financing during 40 months. Conse-

quently the court was justified in concluding that appellant could not have remedied the breach by obtaining financing and commencing construction within 30 days.

▮▮▮ Appellant also argues that the city was required to give the three-day statutory notice in accordance with the provisions of section 791 of the Civil Code and sections 1161 and 1162 of the Code of Civil Procedure.

However, the cases do not stand for the proposition that where the lease specifies the giving of a 30-day notice the three-day statutory notice must also be given. In *Igauye* v. *Howard*, 114 Cal.App.2d 122, 126 [249 P.2d 558], the lease provided that if rent was not paid the lessor had the right to re-enter and retake the premises "without previous notice or demand." It was held the provision did not ipso facto work a forfeiture, but only gave the lessor an option to terminate in accordance with law and by giving statutory notice. To the same effect is *Standard Livestock Co.* v. *Pentz*, 204 Cal. 618, 630 [269 P. 642, 62 A.L.R. 1239].

We believe, also, that the city's position that these particular statutory notices have nothing to do with a declaratory relief action or one to quiet title, is well taken. Such notices are required by statute in unlawful detainer or forcible entry and detainer cases, and are prerequisites only in such actions. The city pleaded a cause of action to quiet title, and there is no requirement that the statutory notices must be given in such an action. (*Paradise Irr. Dist.* v. *Barry*, 220 Cal. 748,750 [32 P.2d 966]; *Hanes* v. *Coffee*, 212 Cal. 777, 779 [300 P. 963]; *Andrews* v. *Russell*, 85 Cal.App. 149 [259 P. 113].)

After termination of the lease, the city sold a portion of the property to a third party. Under the lease, appellant had the right of first refusal to purchase the property if during the term or any extension thereof the city decided to sell. Appellant contends this was an independent covenant, in the nature of an option, which survived a wrongful termination of the lease.

Since we conclude that the lease was not wrongfully terminated, we will not dwell upon appellant's contention that the city breached the terms of the lease by not giving it the first right of refusal to buy the property.

The judgment is affirmed.

Conley, P. J., and Gargano, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 26, 1968.