[No. C021828. Third Dist. Oct. 2, 1997.]

DOUGLAS V. SHAW, Plaintiff and Respondent, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant
and Appellant.

**COUNSEL**

P. Martin Simpson, Jr., James E. Holst, John F. Lundberg, Robert Barnes, Arnold, White & Durkee, Gerald P. Dodson and James F. Valentine for Defendant and Appellant.

Miller, Starr & Regalia, Marvin B. Starr and Lynne M. Yerkes for Plaintiff and Respondent.

## OPINION

**SCOTLAND, J.**—This case involves a dispute over a policy of the Regents of the University of California (the University) which provides that, as a condition of employment by the University, an employee must assign to the University any of the employee's inventions and patents conceived in the course of employment; as consideration for the assignment, the employee will get a percentage of those net royalties and fees received by the University for a patented invention.

When Associate Professor Douglas V. Shaw was hired by the University to teach and do research, the patent policy specified that employees would get 50 percent of the net royalties and fees received from their inventions. The University later revised the policy to reduce this percentage. When the University announced it would pay Shaw the reduced percentage for his patented inventions conceived after the policy change, Shaw brought this action, seeking a declaration that he is entitled to 50 percent of the net royalties and fees.

The University appeals from the judgment entered in Shaw's favor following an order granting summary judgment on his complaint for declaratory relief. According to the University, the patent policy in effect at the time Shaw was hired was not part of the patent agreement signed by Shaw as a condition of his employment; rather, it is a personnel policy that the University may modify unilaterally at any time.

We shall affirm the judgment. As we shall explain, the patent agreement between Shaw and the University is a contract which incorporates the terms of the patent policy in effect at the time Shaw was hired. Although the University is entitled to revise its patent policy, it cannot do so with respect to Shaw because of its written agreement with him, specifying that he would receive 50 percent of the net royalties and fees from his inventions patented by the University.

### FACTS AND PROCEDURAL BACKGROUND

Shaw was hired in 1986 to teach and do research in the department of pomology at the University of California, Davis. Pomology is the science of the cultivation of fruits. In recent years, Shaw has concentrated his research on the genetics of strawberries.

At the time he became a member of the University faculty, Shaw was asked to sign a single-page, two-sided University form document entitled

"STATE OATH OF ALLEGIANCE and PATENT AGREEMENT." The document contains (1) a half-page "STATE OATH OF ALLEGIANCE," (2) a half-page "PATENT AGREEMENT," and (3) the "UNIVERSITY POLICY REGARDING PATENTS" (the Patent Policy).

The Patent Policy begins on one side of the document and continues onto the next side. It states that the University, "in administering intellectual property rights for public benefit, desire[s] to encourage and assist members of the faculties, employees, and others associated with the University in the use of the patent system with respect to their discoveries and inventions in a manner that is equitable to all parties involved."

The Patent Policy provides that "[a]n agreement to assign inventions and patents to the [University] . . . shall be mandatory for all employees, for persons not employed by the University but who use University research facilities and for those who receive grant or contract funds through the University." It also provides that exceptions to this assignment requirement may be authorized when "the mission of the University is better served" thereby.

As to those who have agreed to assign their inventions to the University, the Patent Policy states that "[t]he [University] agree[s], for and in consideration of said assignment of patent rights, to pay annually to the named inventor(s), the inventor(s)' heirs, successors, or assigns 50 percent of the net royalties and fees received by [the University]."

The patent agreement obligates the signatory to inform the University promptly of "every possibly patentable device, process, plant or product, hereinafter referred to as 'invention,'" which the signatory may conceive in the course of University employment. Should the University deem the invention patentable, the signatory promises thereafter "to assign to University all rights, title and interest" in the invention.

Directly under the title of the patent agreement appear the words: "Please read the Patent Policy on reverse side and above." The first paragraphs of the patent agreement state: "This agreement is made by me with The Regents of the University of California, a corporation, hereinafter called 'University,' in part consideration of my employment, and of wages and/or salary to be paid to me during any period of my employment, by University, and/or my utilization of University research facilities. [¶] By execution of this agreement, I understand I am not waiving any rights to a percentage of royalty payments received by University, as set forth in University Policy Regarding Patents, hereinafter called 'Policy.'"

Shaw signed the patent agreement on February 25, 1986.

At or near the time he assumed his position at the University, Shaw also received a pamphlet from the University entitled "Patent Practices at the University of California." It summarizes the Patent Policy and states that, in exchange for their agreement to assign patents to the University, employees shall receive 50 percent of net royalties and fees received by the University for their inventions.

*The Revised Patent Policy and Shaw's Inventions*

In 1989, the University announced its intention to revise the Patent Policy to reduce the percentage of royalties it would pay to inventors.

In written memoranda to the University, Shaw objected to the application of a revised Patent Policy to individuals who, like him, had signed the patent agreement under the then existing Patent Policy.

In April 1990, the University officially revised its Patent Policy to reduce an inventor's share of net royalties and fees from a flat rate of 50 percent to a sliding scale in which the inventor would receive 50 percent of the first $100,000, 35 percent of the next $400,000, and 20 percent of any additional net royalties and fees. The University's president announced that the creation of this sliding scale "responds to internal criticisms of the present system and to concerns that—particularly in a public institution—the goal of such a policy should be to provide support and incentives for further productive research rather than the highest earnings for individual inventors." In the University's view, its 1990 Patent Policy increases the percentage of royalties that can be used to fund additional research and "is much more in line with what most of the other universities in the states do."

In December 1992, Shaw (as coinventor with two other University professors) disclosed to the University his invention of six new strawberry cultivars. The University informed Shaw that these inventions "will be governed by the UC Patent Policy at the time of the disclosure," i.e., by the 1990 Patent Policy which calculates an inventor's share of net royalties on declining sliding scale.

Shaw objected and argued the University should instead "meet its obligation under the Patent Agreement that [Shaw] signed" to pay inventors 50 percent of the net royalties. The University declined, asserting that the Patent Policy is not a contract but merely a "personnel policy grounded in the employment relationship" and the University "may prospectively change its

personnel policies unilaterally," provided it gives advance notice to employees of its intent to do so.

The University directed Shaw to execute an assignment of his interest in the patents of the six strawberry cultivars. The assignment provided that net royalties for the new plants would be divided in accordance with the "benefits stipulated for the inventor in the 'University of California Patent Policy' revised effective April 16, 1990, which document is made by reference a part hereof and in fulfillment of the Assignor's Patent Agreement with the University of California . . . ." When Shaw refused to sign the assignment, the University agreed to modify its terms to provide that consideration for the assignment includes a share of net royalties in accordance with "the applicable University of California Patent Policy," so as to preserve the parties' respective positions on what policy should apply.

*The Lawsuit*

Shaw then brought this action, seeking a declaration that, (1) in consideration for his execution of the patent agreement, the University agreed to distribute to him 50 percent of the net royalties and fees accruing from any invention he might conceive, and (2) the University may not unilaterally modify the terms of the patent agreement without Shaw's written consent.

Shaw moved for summary judgment on the grounds that (1) absent the patent agreement, the University has no right or interest in any of Shaw's inventions; (2) in the text of the patent agreement, Shaw expressly reserves his rights to "a percentage of royalty payments received by University, as set forth in the University Policy Regarding Patents"; (3) the University may not unilaterally modify the patent agreement's terms without his consent; and (4) Shaw continues to own those patent rights which he did not waive, i.e., 50 percent of the net royalties and fees with respect to any invention.

In opposition to Shaw's motion, the University did not challenge Shaw's statement of undisputed facts; it opted instead to supplement the record with further undisputed facts of its own. The University also argued in pertinent part that (1) because Shaw's employment is governed by statute, not contract, he can maintain no contract action against the University; (2) the "Patent Policy" in effect at the time Shaw signed the patent agreement is not a contract and thus may be changed unilaterally by the University, so long as Shaw received notice of the new policy and a reasonable time within which to decide whether to continue under the new policy or to seek different employment; (3) the patent agreement operates as a complete transfer of Shaw's rights in all as-yet-uninvented plants or processes to the University; and (4) the University has done nothing to modify the patent agreement.

The trial court granted Shaw's motion for summary judgment and issued a statement of decision. The court found that Shaw had presented a prima facie case establishing that the patent agreement constitutes an enforceable contract with the University; that the patent agreement must be interpreted in accordance with the Patent Policy set forth on the same document; and that the University's 1990 modification of the Patent Policy cannot effectively modify the parties' patent agreement, in light of Shaw's objection. Accordingly, the court held, the patent agreement must be construed to require the University to pay Shaw 50 percent of the net royalties and fees received by the University for all inventions disclosed by Shaw.

The trial court entered judgment in favor of Shaw, and this appeal ensued.

DISCUSSION

I

The University begins its argument on appeal by advancing a theory that it admits was not raised before the trial court. Characterizing Shaw's complaint as "a challenge to the administrative decisions of a state agency in establishing its policies," the University claims the trial court erred in applying "a straightforward contract analysis" rather than the standard of review for a mandamus action, i.e., that the University's decision to revise its Patent Policy must be upheld so long as it is not arbitrary, capricious, or entirely lacking in evidentiary support.

To support this argument, the University relies principally on the decision in *Bunnett* v. *Regents of University of California* (1995) 35 Cal.App.4th 843 [41 Cal.Rptr.2d 567], which was issued after the entry of judgment in this case.

Generally, a party may not raise a new contention on appeal. (*Ernst* v. *Searle* (1933) 218 Cal. 233, 240-241 [22 P.2d 715]; *In re Marriage of Moschetta* (1994) 25 Cal.App.4th 1218, 1227 [30 Cal.Rptr.2d 893].) An exception exists, however, in cases where a new point of law is decided after the trial (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 654, fn. 3 [209 Cal.Rptr. 682, 693 P.2d 261]) or where the new theory "presents a question of law to be applied to undisputed facts in the record." (*Hoffman-Haag* v. *Transamerica Ins. Co.* (1991) 1 Cal.App.4th 10, 15 [1 Cal.Rptr.2d 805].) Application of this rule is discretionary with the reviewing court. (*In re Marriage of Moschetta, supra,* 25 Cal.App.4th 1218, 1227; see 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 322, p. 332.)

We shall consider, but reject, the University's claim of error. While it is true the University's administrative decisions regarding its faculty are

properly reviewed by writ of mandate (e.g., *McGill* v. *Regents of University of California* (1996) 44 Cal.App.4th 1776, 1785 [52 Cal.Rptr.2d 466] [denial of tenure]; *Bunnett* v. *Regents of University of California, supra,* 35 Cal.App.4th at pp. 847-848 [denial of professor's application to enroll in early retirement incentive program]), Shaw does not challenge an administrative decision of the University. He seeks an interpretation of his existing written contract with the University.

As a general proposition, mandamus is not an appropriate remedy for enforcing a contractual obligation against a public entity. (*California Teachers Assn.* v. *Governing Board* (1984) 161 Cal.App.3d 393, 399 [207 Cal.Rptr. 659]; *Wenzler* v. *Municipal Court* (1965) 235 Cal.App.2d 128, 132 [45 Cal.Rptr. 54].) Thus, the trial court correctly applied contract principles in resolving the parties' dispute over the patent agreement.

## II

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

The University does not contend that there are material issues of triable fact. Rather, the parties' chief disagreement concerns the legal effect of the patent agreement. This poses a legal question which we consider de novo on appeal. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839] [where the interpretation of written instrument does not turn on the credibility of extrinsic evidence, it poses a pure question of law].)

▇ We first consider whether Shaw has demonstrated that he is entitled to a declaration on summary judgment that the patent agreement is an enforceable agreement which entitles him to 50 percent of the net royalties and fees from his strawberry cultivars.

▇ An action for declaratory relief is appropriate to determine the legal rights and duties of the parties to a written contract. (Code Civ. Proc., § 1060.) Where, as here, the only cause of action is one for declaratory relief, a motion for summary judgment likewise is appropriate. (*National Exhibition Co.* v. *City and County of San Francisco* (1972) 24 Cal.App.3d 1, 11 [100 Cal.Rptr. 757]; *Michelman* v. *Frye* (1965) 238 Cal.App.2d 698, 702 [48 Cal.Rptr. 142].)

▇ The written patent agreement, signed by Shaw, contains all the essential elements of a contract: "(1) parties capable of contracting; (2) their

consent; (3) a lawful object; and (4) a sufficient cause or consideration. (Civ. Code, § 1550.)" (*Marshall & Co.* v. *Weisel* (1966) 242 Cal.App.2d 191, 196 [51 Cal.Rptr. 183].) The University's statement of undisputed facts raises no issue of material fact as to whether the patent agreement is a valid agreement.

■ To resolve the parties' dispute concerning the meaning and effect of the patent agreement, we resort to the traditional rules governing interpretation of contracts, which "teach us that the overriding goal of interpretation is to give effect to the parties' mutual intentions as of the time of contracting. . . . Where contract language is clear and explicit and does not lead to absurd results, we ascertain intent from the written terms and go no further." (*Ticor Title Ins. Co.* v. *Employers Ins. of Wausau* (1995) 40 Cal.App.4th 1699, 1707 [48 Cal.Rptr.2d 368], citations and fn. omitted.)

■ By its terms, the patent agreement embodies Shaw's promises to disclose any inventions he may create in the future so that the University may "examine[] . . . and determine rights and equities therein in accordance with the Policy" and, if the University "desires . . . to seek patent protection thereon," to assign his interest in the invention to the University.

The clear language of the patent agreement does not, as the University argues, effect a contemporaneous and "complete transfer of plaintiff's rights to the University." Accordingly, the University's reliance upon cases in which the parties' agreement so provides is misplaced. (E.g., *Cubic Corp.* v. *Marty* (1986) 185 Cal.App.3d 438, 444, 448 [229 Cal.Rptr. 828] [invention agreement provided that all inventions by employee "shall be the sole and exclusive property" of the employer] and *Treu* v. *Garrett Corp.* (1968) 264 Cal.App.2d 432, 433 [70 Cal.Rptr. 284] [same].)

We turn now to the critical issue: Does the patent agreement entitle Shaw to 50 percent of the net royalties of any invention that he may create and thereafter assign to the University?

It is undisputed that the text of the patent agreement itself contains no provision identifying what percentage, if any, of net royalties shall be paid to an employee who creates a patentable invention in the course of University employment. It also is undisputed that the Patent Policy, which is printed on the same document as the patent agreement signed by Shaw, contains an agreement by the University to pay 50 percent of the net royalties to an inventor who has assigned an invention to the University.

Shaw contends that the patent agreement incorporates the Patent Policy and its 50 percent royalty provision. We agree.

"A contract may validly include the provisions of a document not physically a part of the basic contract. . . . 'It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document. [Citations.] But each case must turn on its facts. [Citation.] For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties.' " (*Williams Constr. Co.* v. *Standard-Pacific Corp.* (1967) 254 Cal.App.2d 442, 454 [61 Cal.Rptr. 912]; accord, *Baker* v. *Aubry* (1989) 216 Cal.App.3d 1259, 1264 [265 Cal.Rptr. 381], and *King* v. *Larsen Realty, Inc.* (1981) 121 Cal.App.3d 349, 357 [175 Cal.Rptr. 226].)

The contract need not recite that it "incorporates" another document, so long as it "guide[s] the reader to the incorporated document." (Compare *Baker* v. *Aubry, supra,* 216 Cal.App.3d at p. 1264 with *Chan* v. *Drexel Burnham Lambert, Inc.* (1986) 178 Cal.App.3d 632, 644 [223 Cal.Rptr. 838].)

Our review of the patent agreement persuades us that, when Shaw signed the agreement, the parties intended it to incorporate the Patent Policy. The patent agreement (1) directs Shaw to "Please read the Patent Policy on reverse side and above," and (2) states that, in signing the patent agreement, Shaw is "not waiving any rights to a percentage of royalty payments received by University, *as set forth in University Policy Regarding Patents*[.]" (Italics added.)

Not only is reference to the Patent Policy " 'clear and unequivocal,' " and its terms " 'easily available to the contracting parties' " (*Williams Constr. Co.* v. *Standard-Pacific Corp., supra,* 254 Cal.App.2d at p. 454), the language we have italicized above expressly defines the "percentage of royalty payments received by [the] University" that Shaw may expect to receive on his invention as that which is "set forth in" the Patent Policy, i.e., 50 percent of net royalties and fees.[1]

We are unconvinced by the University's assertion that it "did not intend to incorporate the Patent Policy as part of the Patent Agreement." Although the intent of the parties determines the meaning of the contract (Civ. Code, §§ 1636, 1638), the relevant intent is "objective"—that

---

[1]In 1990, the University revised the patent agreement to include the following: "I also understand and agree that the University has the right to change the Policy at any time, including the percentage of net royalty payments paid to me."

is, the objective intent as evidenced by the words of the instrument, not a party's subjective intent. (*Beck* v. *American Health Group Internat., Inc.* (1989) 211 Cal.App.3d 1555, 1562 [260 Cal.Rptr. 237].) Nothing in the patent agreement hints at what the University now claims was its long-held desire that the Patent Policy's inventor royalty provision not be incorporated into the patent agreement.[2] The true intent of a contracting party is irrelevant if it remains unexpressed. (211 Cal.App.3d 1555, 1562; see also *City of Mill Valley* v. *Transamerica Ins. Co.* (1979) 98 Cal.App.3d 595, 603 [159 Cal.Rptr. 635].)

In the trial court, the University argued that it is not bound by the terms of the pre-1990 Patent Policy because that document is not a contract. Documents which are not contracts may be incorporated into a contract, however. (See, e.g., *Baker* v. *Aubry, supra,* 216 Cal.App.3d at pp. 1262, 1264 [document deemed incorporated was New York Stock Exchange Rules] and *King* v. *Larsen Realty, Inc., supra,* 121 Cal.App.3d at pp. 353, 357 [documents deemed incorporated were bylaws of realtors' association and arbitration manual].)

■ We find no merit in the University's suggestion that, as a public employee who is employed pursuant to statute, not contract, Shaw has no vested contractual right in his terms of employment, such terms being subject to change by the University.

In each of the two cases upon which the University relied for this proposition, the public employee bringing a contract action had no written contract with his public employer. (*Kemmerer* v. *County of Fresno* (1988) 200 Cal.App.3d 1426, 1431-1432 [246 Cal.Rptr. 609] [civil service employee had no contract of employment which included an implied covenant of good faith and fair dealing]; *Gabe* v. *County of Clark* (9th Cir. 1983) 701 F.2d 102, 103 [county policy which changed employee's status to "at will" cannot affect the status of her employment without her knowledge].)

When a public employer chooses instead to enter into a written contract with its employee (assuming the contract is not contrary to public policy), it cannot later deny the employee the means to enforce that agreement.

■ We also reject the University's argument that the Patent Policy is a mere personnel policy which it may modify unilaterally. Although the University is entitled to revise its Patent Policy, it cannot do so with respect

---

[2]The University asks us to take judicial notice of its standing order No. 100.4 (mm); the University Bulletin, volume 11, No. 39; minutes of the University Board of Patents meeting on April 29, 1963; and various United States patents issued in or before 1989. (Evid. Code, §§ 452, subds. (b), (c) and 459, subd. (a).) As these documents are not pertinent to our analysis, we deny the request. (Evid. Code, § 454, subd. (a)(1).)

to Shaw because of its written agreement with him. The University prepared, and Shaw signed, a patent agreement whose references to the Patent Policy are so direct as to indicate the parties' intent to incorporate the policy's then-existing terms into the patent agreement, including the University's promise to pay Shaw 50 percent of the net royalties of any patentable invention. Whether, absent the incorporation, the Patent Policy would constitute a mere statement of personnel policy is immaterial. Having made the Patent Policy a part of its written agreement with Shaw, the University may not unilaterally revise it as to him.

In sum, we conclude that the patent agreement signed by Shaw incorporates the Patent Policy, and the University may not refuse to allocate the 50 percent net royalty payments attributable to Shaw's inventions in accordance with the terms of the document.

## DISPOSITION

The judgment is affirmed. The University shall pay Shaw's costs on appeal.

Sims, Acting P. J., and Sparks, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied December 23, 1997.

---

*Retired Associate Justice of the Court of Appeal, Third District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.