Filed 3/29/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| B.D., a Minor, etc., et al.,<br><br>     Plaintiffs and Respondents,<br><br>     v.<br><br>BLIZZARD ENTERTAINMENT, INC.,<br><br>     Defendant and Appellant. | D078506<br><br><br><br>(Super. Ct. No. 37-2020-00020000-CU-BT-CTL) |

APPEAL from an order of the Superior Court of San Diego County, John S. Meyer, Judge.  Reversed with directions.

Greenberg Traurig, Jeff E. Scott, Robert J. Herrington and Dominic E. Draye for Defendant and Appellant.

Blood Hurst & O'Reardon, Timothy G. Blood, Leslie E. Hurst, Thomas J. O'Reardon II; Law Offices of Andrew J. Brown and Andrew J. Brown for Plaintiffs and Respondents.

Blizzard Entertainment, Inc. (Blizzard) appeals from an order denying its motion to compel arbitration.  B.D., a minor, played Blizzard's online videogame "Overwatch," and used "real money" to make in-game purchases of "Loot Boxes"—items that offer "randomized chances . . . to obtain desirable or helpful 'loot' in the game."  B.D. and his father (together, Plaintiffs) sued Blizzard, alleging the sale of loot boxes with randomized values constitutes unlawful gambling, and, thus, violates the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200).  Plaintiffs seek only prospective injunctive relief, plus attorney fees and costs.

Blizzard moved to compel arbitration based on the dispute resolution policy incorporated into various iterations of the online license agreement that Blizzard presented to users when they signed up for, downloaded, and used Blizzard's service.  The trial court denied the motion, finding a "reasonably prudent user would not have inquiry notice of the agreement" to arbitrate because "there was no conspicuous notice of an arbitration" provision in any of the license agreements.  We disagree.

As we will explain, the operative version of Blizzard's license agreement—the most recent version presented in 2018 before Plaintiffs filed suit—was presented to users in an online pop-up window that contained the entire agreement within a scrollable text box.  We present a screenshot here and as an appendix to this opinion:[1]

_____

[1]     See appendix A, *post*, page 40.



As the screenshot shows, the portion of the license agreement immediately visible in the text box displayed two significant notices. First, that users may not use Blizzard's service if they do not agree to all of the terms in the license agreement. And second, that users should read the section of the license agreement "below" titled "dispute resolution" because it contains an arbitration agreement and class action waiver that affect users' legal rights. That section stated that disputes under the license agreement would be resolved in accordance with Blizzard's dispute resolution policy, to which the section connected via hyperlink. The dispute resolution policy contained a comprehensive arbitration agreement. The pop-up window admonished users that by clicking the "Continue" button (immediately below

the admonishment) the user "acknowledge[d] that [he or she has] read and understood the [license agreement]."  B.D. could not have continued to use Blizzard's service if he did not click the "Continue" button, and Blizzard's records indicate B.D. did, in fact, continue to use the service.  In the context of the transaction at issue, we conclude Blizzard's pop-up notice provided sufficiently conspicuous notice of the arbitration agreement such that Plaintiffs are bound by it.

Alternatively, Plaintiffs contend that if we conclude the parties formed an arbitration agreement, it is unenforceable because the agreement, together with its class and collective action waiver provision, run afoul of the rule announced in *McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945 (*McGill*) that "a provision in *any* contract . . . that purports to waive, in all fora, the statutory right to seek public injunctive relief . . . is invalid and unenforceable." (*Id.* at p. 962.)  For reasons we will explain, we conclude the arbitration agreement clearly and unmistakably delegated the resolution of this type of gateway issue to the arbitrator, not the courts.

Accordingly, we reverse the trial court's order denying Blizzard's motion to compel arbitration and direct the court to enter a new order granting the motion.

FACTUAL AND PROCEDURAL BACKGROUND

*The Complaint*

In March 2020, Plaintiffs sued Blizzard for allegedly violating the UCL. They allege B.D. purchased Blizzard's online game, Overwatch, for about $40, and thereafter made additional purchases of Loot Boxes totaling about $10. Loot Boxes are caches of virtual items (e.g., better costumes, character-specific actions, or speech lines) that enhance the gameplay experience.  The loot in Loot Boxes varies in rarity and perceived value.  A player can earn

4

Loot Boxes through gameplay, or purchase them online from Blizzard. Plaintiffs allege B.D. spent about 50 hours playing Overwatch over the course of about two years.

Plaintiffs allege Blizzard's sale of Loot Boxes constitutes unlawful gambling because the player does not know what loot will be awarded until after the purchase is complete. The complaint asserts a single cause of action for violation of the UCL, and prays for injunctive relief, attorney fees, and costs.

*Blizzard's Motion to Compel Arbitration*

Blizzard moved to compel arbitration of Plaintiffs' claim on the basis it falls within the scope of an arbitration agreement incorporated into various iterations of the license agreement Blizzard presented to users when they create an online account, install Blizzard's software, and access the online game.

Blizzard explained that to play any of its online games, make in-game purchases, or interact with other online players, B.D. needed an account on Blizzard's online platform, "Battle.net." To create an account, a user was required to enter certain information (e.g., name, age, email address) and click a button titled "Create a Free Account." Below this button was a notice stating: "By clicking on 'Create a Free Account,' I agree to the Battle.net End User License Agreement and Privacy Policy." The text "Battle.net End User License Agreement" and "Privacy Policy" were hyperlinks that took users to another webpage containing the entire referenced documents. Blizzard's

records showed that a Battle.net account under B.D.'s name was created on June 20, 2016.[2]

When B.D.'s Battle.net account was created, the 2015 version of Blizzard's End User License Agreement was in effect.[3] The top of the first page of the 2015 License Agreement contained the following notice:

> "YOU SHOULD CAREFULLY READ THE FOLLOWING AGREEMENT (THE 'AGREEMENT') BEFORE INSTALLING THE BATTLE.NET CLIENT OR US[ING] THE BATTLE.NET SERVICE. IF YOU DO NOT AGREE WITH ALL OF THE TERMS OF THIS AGREEMENT, YOU MAY NOT INSTALL THIS SOFTWARE PROGRAM."

The first page also advised:

> "IF YOU DO NOT AGREE TO THE TERMS OF THIS AGREEMENT, YOU ARE NOT PERMITTED TO INSTALL, COPY OR USE THE BATTLE.NET CLIENT OR ANY OF THE GAMES."

The License Agreement explained how a user could reject the terms of the agreement and seek a refund.

Paragraph 11 of the 2015 License Agreement, titled "Dispute Resolution," stated as follows:

> "Any and all disputes between you and Blizzard which arose out of this Agreement will be resolved in accordance with the Blizzard Entertainment Dispute Resolution Policy, which is available for your review here: http://us.blizzard.com/enus/company/legal/dispute-resolution-policy.html."

---

[2] For readability, we sometimes refer to B.D. as having taken an action as shorthand for stating that someone using account credentials matching B.D.'s took that action.

[3] We will refer generally to each "End User License Agreement" as a "License Agreement." When necessary to distinguish among the agreements, we will include the year the License Agreement took effect (e.g., "the 2015 License Agreement").

The web address (or URL) for the Blizzard Entertainment Dispute Resolution Policy (Dispute Resolution Policy) was *not* a hyperlink. Instead, a user would have to type or copy-and-paste the address into a web browser.

The Dispute Resolution Policy in effect at all relevant times is about three pages long and includes sections titled "BINDING ARBITRATION" and "CLASS AND COLLECTIVE ACTION WAIVER." As we explain in greater detail in Discussion Part II.A.1., *post*, these provisions generally require that users arbitrate "Disputes" on an individual basis.[4]

The first substantive paragraph of the Dispute Resolution Policy advises users that "[b]y agreeing to the [License Agreement], [they] [t]hereby consent to th[e] [Dispute Resolution Policy]." The last substantive paragraph advises users that if they "desire to reject" the Dispute Resolution Policy, they should "not complete installation and return [their] product to its place of purchase for a full refund. Completion of the installation process shall indicate . . . acceptance of th[e] [Dispute Resolution Policy]."

To complete the account-creation process, B.D. had to click the "Create a Free Account" button. It was possible to click this button without clicking the hyperlink to the License Agreement.

After B.D.'s account was created, he still had to download the Battle.net software application (App) to his computer to be able to launch and play Overwatch. Before completing the App installation process, B.D. would have been presented with a scrollable text box containing the entire 2015

---

[4] The Dispute Resolution Policy defines a "Dispute" as "any dispute, controversy, or claim, whether based on contract, tort, fraudulent misrepresentation, statute, regulation, constitution, common law, equity, or any other matter that arises out of or relates to the North American Battle.net . . . License Agreement." Whether Plaintiffs' claim falls within the scope of this definition is not at issue here.

License Agreement, followed by buttons labeled "Accept" and "Decline." To complete the installation process, B.D. would have had to click "Accept."

In 2017, Blizzard updated its License Agreement. The first page of the updated agreement included substantially similar notices as the 2015 License Agreement regarding the requirement that users agree to its terms as a condition of accessing Blizzard's online service.[5] The 2017 License Agreement also included the same "Dispute Resolution" section as the prior agreement, except now the provision included a hyperlink to the Dispute Resolution Policy instead of a mere URL to type or copy-and-paste.[6]

The 2017 License Agreement was presented to users via a pop-up window that appeared when a user logged into his or her Battle.net account. The pop-up contained a scrollable text box containing the entire 2017 License Agreement. Immediately below the text box was a notice stating, " 'By clicking "Agree", I accept the [2017 License Agreement] applicable to my country of residence and if under 18 years old, agree and acknowledge that my parent or guardian has also reviewed and accepted the [2017 License Agreement] on my behalf.' "

---

[5] The first substantive paragraph of the 2017 License Agreement states: "**YOU SHOULD CAREFULLY READ THIS AGREEMENT (THE 'AGREEMENT') BEFORE INSTALLING OR USING BLIZZARD'S ONLINE GAMING PLATFORM. IF YOU DO NOT AGREE WITH ALL OF THE TERMS OF THIS AGREEMENT, YOU MAY NOT INSTALL OR OTHERWISE ACCESS THE PLATFORM**."
The second substantive paragraph includes the following notice: "IF YOU DO NOT AGREE TO THE TERMS OF THIS AGREEMENT, YOU ARE NOT PERMITTED TO INSTALL, COPY, OR USE THE BLIZZARD PLATFORM."

[6] The Dispute Resolution section of the 2017 License Agreement also replaced the word "arose" with "arise."

8

To continue using his Battle.net account after the 2017 License Agreement update, B.D. would have had to click the "Agree" button. Blizzard's records indicate B.D. continued using his account after this update.

Also in 2017, B.D. linked his Battle.net account to his Xbox Live account. Blizzard explained that, "[t]o link these accounts, B.D. would have had to log in with his Battle.net account, which would have prompted him to accept the 2017 License Agreement . . . . By linking the accounts, any time B.D. played Overwatch (on Xbox or computer) he was using the Battle.net service."

In June 2018, Blizzard again updated its License Agreement. The front page of this updated agreement included the same notices as the 2017 License Agreement regarding the requirement that users agree to its terms as a condition of accessing Blizzard's online service. (See fn. 5, *ante*.) The front page also included the following new notice regarding the Dispute Resolution section:

> "**PLEASE NOTE THAT THE SECTION BELOW TITLED 'DISPUTE RESOLUTION' CONTAINS A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER. THEY AFFECT YOUR LEGAL RIGHTS. PLEASE READ THEM**."

The Dispute Resolution section of the 2018 License Agreement was identical to the one in the 2017 License Agreement, including the hyperlink to the Dispute Resolution Policy.

Blizzard presented the 2018 License Agreement to users via a pop-up window when users logged into their Battle.net account. A portion of the first page of the 2018 License Agreement was immediately visible within a window of the pop-up, and users could scroll through the entire remainder of the agreement within this window. The new notice regarding the Dispute Resolution section and the notices regarding the requirement that users

agree to the License Agreement as a condition of accessing Blizzard's online service were immediately visible within the window without the user having to scroll. At the bottom of the pop-up (outside the scrollable text box), a message stated, "By clicking 'Continue', I acknowledge that I have read and understood the [2018 License Agreement] applicable to my country of residence." Immediately below this notice were boxes labeled "Continue" and "Cancel." Blizzard's records indicate B.D. clicked the "Continue" button on July 3, 2018.

Blizzard's records indicate B.D. purchased 50 Loot Boxes while playing Overwatch on his Xbox console on September 2, 2018. When B.D. made this purchase, he had already linked his Xbox Live account to his Battle.net account.

Blizzard argued in its motion that B.D. had assented to the arbitration provision in the Dispute Resolution Policy four times: (1) when he clicked "Create a Free Account" when he created his account in 2016; (2) when he clicked "Accept" to download and install the App in 2016; (3) when he clicked "Agree" in the pop-up presenting the updated 2017 License Agreement; and (4) when he clicked "Continue" in the pop-up presenting the updated 2018 License Agreement.

Blizzard further argued that any disputes regarding arbitrability or enforceability of the arbitration agreement were delegated to the arbitrator under the Dispute Resolution Policy's delegation clause (set forth in Discussion part II.A.1., *post*).

*Plaintiffs' Opposition*

Plaintiffs opposed Blizzard's motion to compel arbitration on several grounds. As relevant here, B.D. and his father submitted declarations asserting they had no *actual* notice of the arbitration provision because they

10

never saw any of the License Agreements or the Dispute Resolution Policy. B.D. stated he "never clicked on any links to read the . . . License Agreement"; he "never scrolled through the . . . License Agreement"; and he "never clicked on any links within the . . . License Agreement." B.D. did not deny clicking the buttons labeled "Create a Free Account," "Accept," "Agree," or "Continue."

Plaintiffs also argued no agreement to arbitrate was formed because they lacked *constructive* notice of the Dispute Resolution Policy's arbitration provision. They maintained the arbitration provision was not sufficiently conspicuous because "the person who created the 'Battle.net' account would have to click on a hyperlink that takes him or her to [a License Agreement], then scroll through 15 pages of the 16 page [License] Agreement to then click on a hyperlink to another 'Dispute Resolution Policy' " that "the person would have to scroll through . . . before finding any reference to 'arbitration' or 'class or representative action waiver.' "

Finally, Plaintiffs argued that even if an agreement to arbitrate and waive class and collective actions had been formed, it was unenforceable under *McGill* because it purported to waive public injunctive relief in all fora. (See *McGill, supra,* 2 Cal.5th at p. 962.)

*Blizzard's Reply*

Blizzard argued in reply that the parties entered into an arbitration agreement because B.D. repeatedly agreed to the terms of the various License Agreements, which validly incorporated the arbitration provision in the Dispute Resolution Policy.

*The Trial Court's Ruling*

The trial court issued a tentative ruling denying Blizzard's motion. The court found that because "there is no evidence that . . . B.D. or his father

11

had actual notice of the arbitration agreement," the "issue is whether a reasonably prudent user would be on inquiry notice of the terms of the arbitration agreement." Under this standard, the court found "there was no conspicuous notice of an arbitration agreement."

Regarding the notice displayed during the 2016 account-creation, the court observed that the webpage referenced a License Agreement, but not an arbitration agreement. And "[i]f the user did review the License Agreement, the user was required to scroll to the bottom of page 15 before coming to a section entitled 'Dispute Resolution,' " which referred the user to a Dispute Resolution Policy available at a different URL, with no hyperlink provided.

As for the pop-up advising of the 2017 License Agreement update, the court reiterated "*if* the user reviewed the License Agreement"—which was not required to access the game—"the user was required to scroll to the bottom of page 11 before coming to the 'Dispute Resolution' section," which now included a hyperlink to the identified Dispute Resolution Policy.

Regarding the pop-up advising of the 2018 License Agreement update, the court acknowledged the notice implored users to read "THE SECTION BELOW TITLED DISPUTE RESOLUTION." But the court stated "there is no 'Dispute Resolution' section 'below.' " The court also stated that, although the pop-up advised that " 'By Clicking Continue' " the user acknowledges he or she has read and understood the License Agreement, "[t]here is nothing that says the user is agreeing to the . . . 'Dispute Resolution Policy.' " The court found this "language and . . . construction . . . is confusing and does not provide notice that 'continue' means agreeing to arbitrate any dispute."

Finally, the court observed that under all of the scenarios in which Blizzard provided notice of its License Agreements, "a user is not required to review the License Agreement, let alone the arbitration agreement."

12

At the hearing, Blizzard's counsel focused on the passage in the tentative ruling stating "there is 'Dispute Resolution' section 'below.' " Counsel explained that the exhibit depicting the 2018 pop-up "is a screenshot of a scrollable text box," and "[t]he *entire* [License Agreement] including the dispute resolution provision . . . was in that box." (Italics added.) But because the exhibit was a static screenshot of a scrollable text box, it captured only "the first portion of the [License Agreement]."

At the end of the hearing, the court confirmed its tentative ruling.

DISCUSSION

I. Existence of an Arbitration Agreement

Blizzard contends the trial court erred by finding that notice of the Dispute Resolution Policy's arbitration provision was not sufficiently conspicuous to establish an agreement to arbitrate. We agree.

A. *Legal Principles*

1. Online Formation of Arbitration Agreements

" 'Under "both federal and state law, the threshold question presented by a petition to compel arbitration is whether there is an agreement to arbitrate." ' " (*Long v. Provide Commerce, Inc*. (2016) 245 Cal.App.4th 855, 861 (*Long*); see *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 (*Pinnacle*); *Sellers v. JustAnswer LLC* (2021) 73 Cal.App.5th 444, 461 (*Sellers*).) "This threshold inquiry stems from the ' "basic premise that arbitration is consensual in nature." ' " (*Long*, at p. 861.) Thus, "[w]hile California public policy favors arbitration, ' " 'there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate.' " ' " (*Sellers*, at p. 461.)

" '[G]eneral principles of contract law determine whether the parties have entered a binding agreement to arbitrate.' " (*Pinnacle*, *supra*, 55

13

Cal.4th at p. 236.) "Mutual assent, or consent, of the parties 'is essential to the existence of a contract' [citations], and '[c]onsent is not mutual, unless the parties all agree upon the same thing in the same sense' [citation]. 'Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings.' " (*Sellers*, *supra*, 73 Cal.App.5th at p. 460; see *Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 270 (*Donovan*) ["An essential element of any contract is the consent of the parties."].)[7] If an offeree objectively manifests assent to an agreement, the offeree cannot avoid a specific provision of that agreement on the ground the offeree did not actually read it. (See *Pinnacle*, at p. 236 ("An arbitration clause within a contract may be binding on a party even if the party never actually read the clause."].)

These consent principles apply "with equal force to arbitration provisions contained in contracts purportedly formed over the Internet." (*Long*, *supra*, 245 Cal.App.4th at p. 862; see *Sellers*, *supra*, 73 Cal.App.5th at p. 460.) "While Internet commerce has exposed courts to many new situations, it has not fundamentally changed the requirement that ' "[m]utual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." ' " (*Long*, at p. 862.)

---

7      Despite the fact the 2015, 2017, and 2018 License Agreements and the Dispute Resolution Policy contain Delaware choice-of-law provisions, "the parties appear to agree that the Court should apply California law in determining whether an arbitration agreement existed." (*Ajzenman v. Office of the Commissioner of Baseball* (C.D.Cal. 2020) 492 F.Supp.3d 1067, 1077, fn. 4 (*Ajzenman*).) In any event, California and Delaware both adhere to the objective theory of contract formation. (See *Sellers*, *supra*, 73 Cal.App.5th at p. 460; *Salamone v. Gorman* (Del. 2014) 106 A.3d 354, 367-368 ["Delaware law adheres to the objective theory of contracts"].)

"In the world of paper contracting, the outward manifestation of assent to the *same thing* by both parties is often readily established by the offeree's receipt of the physical contract." (*Sellers*, *supra*, 73 Cal.App.5th at p. 461.) "By contrast, when transactions occur over the internet, there is no face-to-face contact and the consumer is not typically provided a physical copy of the contractual terms. In that context, and in the absence of actual notice, a manifestation of assent may be inferred from the consumer's actions on the website—including, for example, checking boxes and clicking buttons—but any such action must indicate the parties' assent to the *same thing*, which occurs only when the website puts the consumer on constructive notice of the contractual terms." (*Ibid.*; see *Stover v. Experian Holdings, Inc.* (9th Cir. 2020) 978 F.3d 1082, 1086 ["notice—actual, inquiry, or constructive—is the touchstone for assent to a contract"].) "Thus, in order to establish mutual assent for the valid formation of an internet contract, a provider must first establish the contractual terms were presented to the consumer in a manner that made it apparent the consumer was assenting to those very terms when checking a box or clicking on a button." (*Sellers*, at p. 461.)

Recently, in *Sellers*, *supra*, 73 Cal.App.5th 444, our court thoroughly discussed the legal landscape regarding the various methods by which contracts are commonly formed online. We borrow extensively from *Sellers* here.[8]

---

8    We requested and received supplemental briefing from the parties regarding *Sellers*'s impact on this case. As we explain further below, although *Sellers* arose in a distinctly different statutory and transactional context, the case provides a very helpful overview of the evolution of online contract-formation.

"Even before the rise of internet transactions, software providers included contractual terms of use in their packaging." (*Sellers*, *supra*, 73 Cal.App.5th at p. 462.) "These agreements, which restricted how the software could be used and provided protection from widespread illegal copying, came to be 'called *shrink-wrap* licenses [fn. omitted] because although the packaging contains notice of the agreement inside, the entire agreement can only be viewed after buying the product and breaking through the plastic shrink-wrap packaging.'" (*Id.* at p. 463, italics added.)

"As consumers began downloading software from websites, agreements similar to shrink-wrap licenses began to appear online. [Citation.] But since there is no packaging on the internet, there was no way for providers to include a physical copy of the contractual terms. Instead, providers would ask customers to agree to the terms, displayed somewhere on their website, by clicking on an ' "I accept" ' or ' "I agree" ' button. [Citation.] This type of agreement became known as a ' "*clickwrap*" ' agreement, 'by analogy to "shrinkwrap," used in the licensing of tangible forms of software sold in packages[,] because it "presents the user with a message on his or her computer screen, requiring that the user manifest his or her assent to the terms of the license agreement by clicking on an icon." ' [Citation.] In most instances, the contractual terms were not actually displayed on the same screen as the 'I accept' button, but were instead provided via a hyperlink that, when clicked, took the user to a separate page displaying the full set of terms." (*Sellers*, *supra*, 73 Cal.App.5th at p. 463, italics added.)

"As the internet evolved, so did the various manners in which providers sought to impose contractual terms on consumers. Most courts now have identified at least four types of internet contract formation, most easily defined by the way in which the user purportedly gives their assent to be

bound by the associated terms:  browsewraps, clickwraps, scrollwraps, and sign-in wraps."  (*Sellers*, *supra*, 73 Cal.App.5th at p. 463.)

"'A "*browsewrap*" agreement is one in which an internet user accepts a website's terms of use merely by browsing the site.'"  (*Sellers*, *supra*, 73 Cal.App.5th at p. 463.)  "'"Unlike a clickwrap agreement, a browsewrap agreement does not require the user to manifest assent to the terms and conditions expressly . . . .  [A] party instead gives his assent simply by using the website,"'" which typically contains a hyperlink somewhere on the page leading to a separate page containing the terms of use to which the owner intends to bind the user.  (*Long*, *supra*, 245 Cal.App.4th at p. 862, quoting *Nguyen v. Barnes & Noble Inc*. (9th Cir. 2014) 763 F.3d 1171, 1176 (*Nguyen*).)  "'Thus, "by visiting the website—something that the user has already done—the user agrees to the Terms of Use not listed on the site itself but available only by clicking a hyperlink."'"  (*Long*, at p. 862, quoting *Nguyen*, at p. 1176.)

As noted, "'[a] "*clickwrap*" agreement is one in which an internet user accepts a website's terms of use by clicking an "I agree" or "I accept" button, with a link to the agreement readily available.'"  (*Sellers*, *supra*, 73 Cal.App.5th at p. 463.)

"'A "*scrollwrap*" agreement is like a "clickwrap," but the user is presented with the entire agreement and must physically scroll to the bottom of it to find the "I agree" or "I accept" button . . . .'"  (*Sellers*, *supra*, 73 Cal.App.5th at pp. 463-464.)

Finally, a "*sign-in wrap*" agreement is a "blend" or "'hybrid'" of browsewrap and clickwrap agreements.  (*Colgate v. JUUL Labs, Inc.* (N.D.Cal. 2019) 402 F.Supp.3d 728, 763.)  "'"*Sign-in-wrap*" agreements are those in which a user signs up to use an internet product or service, and the

17

sign-up screen states that acceptance of a separate agreement is required before the user can access the service. While a link to the separate agreement is provided, users are not required to indicate that they have read the agreement's terms before signing up.' [Citations.] Instead, 'the website is designed so that a user is notified of the existence and applicability of the site's "terms of use" [usually by a textual notice] when proceeding through the website's sign-in or login process.' " (*Sellers*, *supra*, 73 Cal.App.5th at p. 464.)

As we will explain below, we conclude Blizzard's License Agreements constitute sign-in wrap agreements.

The "wrap" methods of online contract-formation provide varying degrees of notice to users, with browsewrap providing the least and scrollwrap providing the most. (*Sellers*, *supra*, 73 Cal.App.5th at p. 471.) Our court recognized in *Sellers* that California "and federal courts have reached consistent conclusions when evaluating the enforceability of agreements at either end of the spectrum, generally finding scrollwrap and clickwrap agreements to be enforceable and browsewrap agreements to be unenforceable." (*Sellers*, at p. 466; see, e.g., *Nguyen*, *supra*, 763 F.3d at p. 1177.)

The *Sellers* court was the first California court "[t]o determine where sign-in wrap agreements fall on th[e] spectrum." (*Sellers*, *supra*, 73 Cal.App.5th at p. 466.) The court concluded "[s]ign-in wrap agreements fall somewhere in the middle of the two extremes of browsewrap and scrollwrap agreements. Sign-in wrap agreements do include a textual notice indicating the user will be bound by the terms, but they do not require the consumer to review those terms or to expressly manifest their assent to those terms by checking a box or clicking an 'I agree' button. Instead, the consumer is

18

purportedly bound by clicking *some other* button that they would otherwise need to click to continue with their transaction or their use of the website—most frequently, a button that allows the consumer to 'sign in' or 'sign up' for an account.  Thus, it is not apparent that the consumer is aware that they are agreeing to contractual terms simply by clicking some other button.  Instead, 'the consumer's assent is "largely passive," ' and *the existence of a contract turns ' "on whether a reasonably prudent offeree would be on inquiry notice of the terms at issue." ' "*  (*Id.* at p. 471, second italics added.)

The *Sellers* court observed that federal courts have generally upheld sign-in wrap agreements, "perhaps in part because the transactions at issue in [those] cases . . . mostly involve a consumer signing up for an ongoing account and, thus, it is reasonable to expect that the typical consumer in that type of transaction contemplates entering into a continuing, forward-looking relationship."  (*Sellers*, *supra* 73 Cal.App.5th at p. 471.)  But, beyond this commonality, the *Sellers* court noted "some important limitations of the current state of the law in these federal cases."  (*Id.* at p. 472.)

First, "[b]ecause the threshold issue of the existence of a contract is for the courts to decide, the issue of conspicuousness is typically characterized as a question of law."  (*Sellers*, *supra*, 73 Cal.App.5th at p. 473.)  But in deciding this issue, courts are actually undertaking "a fact-intensive inquiry" of "largely subjective" criteria, such as the size, color, contrast, and location of any text notices; the obviousness of any hyperlinks; and overall screen "clutter."  (*Ibid*.)  Not surprisingly, then, the *Sellers* court observed that different federal courts have reached "seemingly inconsistent results" (*ibid*.) about the conspicuousness of "essentially the same . . . sign-up webpages" (*id.* at p. 474, citing *Metter v. Uber Technologies, Inc.* (N.D.Cal., Apr. 17, 2017, No. 16-CV-06652-RS) 2017 WL 1374579, at p. *3 [finding Uber's sign-in wrap

19

sufficiently conspicuous] and *Cullinane v. Uber Technologies, Inc.* (1st Cir. 2018) 893 F.3d 53, 63 [finding Uber's sign-in wrap *not* sufficiently conspicuous]).

Second, the *Sellers* court noted that, because the "courts have relied on similarly, subjective views about the experience, knowledge, and skill level of the 'typical' online consumer" (*Sellers*, *supra*, 73 Cal.App.5th at p. 474), "it is more appropriate to focus on the providers, which have complete control over the design of their websites and can choose from myriad ways of presenting contractual terms to consumers online" to "eliminate any uncertainty as to the consumer's notice of contractual terms and assent to those very terms" (*id.* at pp. 475-476).

In this respect, "the transactional context is an important factor to consider and is key to determining the expectations of a typical consumer." (*Sellers*, *supra*, 73 Cal.App.5th at p. 481.) Thus, "when the transaction is one in which the typical consumer would not expect to enter into an ongoing contractual relationship," such as buying a single flower arrangement or pair of socks, downloading free software, or signing up for a free trial, the consumer "is less likely to be looking for" contractual terms. (*Id.* at p. 476; see *Long*, *supra*, 245 Cal.App.4th at p. 866 [online purchase of flower arrangement]; *Specht v. Netscape Communications Corp.* (2d Cir. 2002) 306 F.3d 17, 32 (*Specht*) [free software download].) "By contrast, the majority of the federal cases finding an enforceable sign-in wrap agreement involve continuing, forward-looking relationships." (*Sellers*, at p. 476; see, e.g., *Meyer v. Uber Technologies, Inc.* (2d Cir. 2017) 868 F.3d 66, 80 (*Meyer*) ["The registration process clearly contemplated some sort of continuing relationship between the putative user and Uber, one that would require some terms and

20

conditions, and the Payment Screen provided clear notice that there were terms that governed that relationship."].)

Applying these principles, the *Sellers* court found a sign-in wrap agreement was not sufficiently conspicuous to put consumers on notice of the service provider's arbitration provision and class action waiver, where the plaintiffs alleged they believed they were paying a one-time fee of $5 to submit a question to an online " 'expert.' " (*Sellers*, *supra*, 73 Cal.App.5th at p. 452.) The plaintiffs alleged the defendant then enrolled them in a costlier, automatically renewing membership, in violation of California's Automatic Renewal Law (ARL), which requires " 'clear and conspicuous' disclosures" and " 'affirmative consent' " to enrollment. (*Sellers*, at p. 452.)

First and foremost, the *Sellers* court found that in the context of a transaction governed by the ARL, the sign-in wrap notices "were not sufficiently conspicuous to bind" the plaintiffs (*Sellers*, *supra*, 73 Cal.App.5th at p. 478) because the notices were "significantly less conspicuous than the statutory notice requirements governing [the plaintiffs'] underlying [ARL] claims" (*id.* at p. 479; see *id.* at p. 480 ["a textual notice of the existence of contractual terms that limit the consumer's ability to address ARL violations should . . . be at least as conspicuous as the notice required by the statute in the first instance"]).

Second, apart from the ARL, the *Sellers* court found the sign-in wrap notices were "not sufficiently conspicuous even when considering the more subjective criteria applied in the more recent federal cases" (*Sellers*, *supra*, 73 Cal.App.5th at p. 478) because the "context of the transaction"—clicking a " 'Start my *trial*' " button to "get the answer to a *single* question for a *one-time* fee of $5" (*id.* at p. 480, italics added)—"is not a situation in which '[t]he registration process clearly contemplated some sort of continuing

21

relationship . . . that would require some terms and conditions' " (*ibid.*, quoting *Meyer*, *supra*, 868 F.3d at p. 80). Rather, in this context, consumers "would not likely be scrutinizing the page" for notices regarding terms of use, which were disclosed (1) "in extremely small print" that contrasted less against the background than other print on the same page; (2) outside the "box containing the payment fields where the consumer's attention would necessarily be focused"; and (3) via a hyperlink that, although underlined, was "not set apart in any other way . . . , such as with blue text or capital letters." (*Sellers*, at pp. 480-481.)

Finally, the court found that additional disclosures contained on the "View response" page that appears "only *after* the user has already signed up for a 'trial' " were not sufficiently conspicuous. (*Sellers*, *supra*, 73 Cal.App.5th at p. 482.) Below the "View response" prompt was a checkbox next to text stating, " 'I agree to the <u>Disclaimer and re-agree to the Terms of Service</u>.' " (*Id.* at p. 456.) Although the court found this disclosure "somewhat more like a clickwrap agreement that is generally enforceable" (*id.* at p. 482), the court nonetheless found it insufficiently conspicuous because the underlined hyperlink "goes to a set of disclaimers regarding the accuracy of the answer the user is about to receive, and *not* to the terms of service" (*id.* at p. 483). The bottom of the accuracy-disclaimer page contained links to the terms of service, with a notice stating, " 'You can read more about these policies in our Terms of Service.' " (*Ibid.*) The court found this language insufficiently conspicuous because it "does not suggest the consumer will be bound by those terms and instead, the entire scenario requires the user 'to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound.' " (*Ibid.*, quoting *Nguyen*, *supra*, 763 F.3d at p. 1179.) "Considering the context of the transaction," the

court found the checkbox disclosure insufficiently conspicuous because "the hyperlink does not take the consumer to terms advising them they would be bound by an agreement to arbitrate.  Instead, the terms are available only if the consumer scrolls through the disclaimers and clicks on a *secondary link* to the terms of service."  (*Sellers*, at pp. 483-484, italics added.)

## 2.  Standard of Review

"A party seeking to compel arbitration 'bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence.'  [Citation.]  Under traditional contract principles, where there is no dispute as to the material facts, 'the existence of a contract is a question [of law] for the court to decide.'  [Citation.]  Where . . . the trial court denies a petition to compel arbitration based on the threshold issue of the existence of a contract, and the evidence of the alleged contract formation consists primarily of undisputed screenshots of the website at issue, our review is de novo."  (*Sellers*, *supra*, 73 Cal.App.5th at p. 462, fn. omitted; see *Pinnacle*, *supra*, 55 Cal.4th at p. 236.)

## B.  *Analysis*

Before we determine whether Blizzard provided sufficiently conspicuous notice of the arbitration provision in the Dispute Resolution Policy so as to bind Plaintiffs, we must first determine which iteration(s) of Blizzard's notices—2016 account-creation, 2016 App-installation, 2017 update pop-up, 2017 account-linking, or 2018 update pop-up—to evaluate.  Blizzard argues that "because all five agreements predate B.D.'s purchase of loot boxes on September 2, 2018 [citation], *any* of them is sufficient to compel arbitration."  Plaintiffs do not squarely address the issue.

We conclude the applicable notice is the pop-up presenting the 2018 License Agreement.  It advised users of the updated 2018 License Agreement,

which was Blizzard's operative agreement when B.D. purchased Loot Boxes on September 2, 2018.  The 2018 License Agreement was the operative agreement because the 2015 and 2017 License Agreements each gave Blizzard the right to "create updated versions of th[e] Agreement (each a 'New Agreement')," in which event the prior "[a]greement will terminate immediately upon the introduction of a New Agreement."  (See, e.g., *CarMax Auto Superstores California LLC v. Hernandez* (C.D.Cal. 2015) 94 F.Supp.3d 1078, 1105 [because " 'a subsequent written contract alters the terms of a previous contract' . . . [¶] . . . courts considering modifications to arbitration clauses have found that, when a term has been altered through a *valid modification*, unconscionability is judged with reference to the *modified* provision, rather than the original, superceded provision."]; *Thiele v. Merrill Lynch, Pierce, Fenner & Smith* (S.D.Cal. 1999) 59 F.Supp.2d 1060, 1064 [holding an arbitration provision in a securities registration form superseded similar provisions in forms previously signed by an employee]; *In re Daily Fantasy Sports Litigation* (D.Mass., Nov. 27, 2019, No. MDL 16-02677-GAO) 2019 WL 6337762, at p. *2 ["for the purpose of resolving DraftKings' motion [to compel arbitration], the Court considers the most recent version of the Terms of Use"].)

We next determine what type of online agreement the 2018 License Agreement constitutes (though we need not dwell on the issue because it is the degree of notice provided, not the label, that is determinative).  Blizzard contends the agreement is a sign-in wrap agreement because "Blizzard required an affirmative click" and "provided notice that agreeing had legal consequences."  Plaintiffs counter that "Blizzard does not have a 'sign-in wrap' agreement" because such an agreement "has come to refer to a situation where the 'I accept' button clearly means acceptance of the terms

24

and conditions, ***and*** the terms and conditions document itself contains the contract term defendant seeks to enforce." Plaintiffs maintain Blizzard does not satisfy the latter criteria because a user would have to click a link to be taken to the License Agreement, and then click a secondary link to be taken to the Dispute Resolution Policy.

Blizzard has the better argument. First, the 2018 License Agreement conforms closely to the *Sellers* court's definition of a sign-in wrap agreement. (See *Sellers*, *supra*, 73 Cal.App.5th at p. 464.) Second, Plaintiffs' characterization does not account for the 2018 pop-up notice, which we now discuss.

To frame our evaluation of the sufficiency of Blizzard's notices, we must first evaluate "the full context of the transaction." (*Sellers*, *supra*, 73 Cal.App.5th at p. 477 ["the full context of the transaction is critical to determining whether a given textual notice is sufficient to put an internet consumer on inquiry notice of contractual terms"].) B.D. purchased Loot Boxes for $10 in a game he had previously purchased for $40. (See *Specht*, *supra*, 306 F.3d at p. 32 [notice insufficiently conspicuous in transaction "where consumers are urged to download free software"].) And he accessed Blizzard's online platform to interact with other players in a videogame he alleges he "spent approximately 50 hours playing . . . over the course of approximately two years." These circumstances "involve a consumer signing up for an *ongoing* account and, thus, it is reasonable to expect that the typical consumer in that type of transaction contemplates entering into a continuing, forward-looking relationship" governed by terms and conditions. (*Sellers*, *supra*, 73 Cal.App.5th at p. 471, italics added; see *id.* at p. 477 [users who "submitted a single question for a 'trial' and a one-time fee" "did not anticipate that they would enter into an ongoing relationship governed by

25

extensive contractual terms"].) This is the type of transaction in which federal courts have generally found sign-in wrap agreements enforceable. (See *id.* at p. 476.)

In this context, we have no trouble concluding the 2018 pop-up notice provided sufficiently conspicuous notice that a user who clicked the "Continue" button at the bottom of the pop-up would be bound by the 2018 License Agreement and the Dispute Resolution Policy incorporated into it.

As for notice of the 2018 License Agreement generally, the pop-up provided sufficiently conspicuous notice. It consisted primarily of a scrollable text box that contained the entire 2018 License Agreement. Thus, unlike in *Sellers*, users did not need " 'to ferret out hyperlinks to terms and conditions.' " (*Sellers*, *supra*, 73 Cal.App.5th at p. 483; see *Specht*, *supra*, 306 F.3d at p. 32 ["a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms"].) Blizzard directly provided those terms and conditions.

Blizzard also made clear the significance of clicking the "Continue" button in the pop-up. Immediately above the button, in white text contrasting against a dark background, the pop-up notice stated: "By clicking 'Continue', I acknowledge that I have read and understand the Blizzard [License Agreement] applicable to my country of residence." The portion of the 2018 License Agreement immediately visible in the text box advised users to "**CAREFULLY READ TH[E] AGREEMENT**," and admonished that they "**MAY NOT INSTALL OR OTHERWISE ACCESS THE PLATFORM**" if they "**DO NOT AGREE WITH ALL OF THE TERMS OF TH[E] AGREEMENT**." This provided sufficiently conspicuous notice to users that by clicking the "Continue" button on the pop-up, they were agreeing to be bound by the 2018 License Agreement.

As for notice of the arbitration agreement specifically, we further conclude the pop-up provided sufficiently conspicuous notice. The portion of the 2018 License Agreement immediately visible in the scrollable text box also advised that the agreement contains a dispute resolution section that, in turn, contains an arbitration agreement and class action waiver:

> "PLEASE NOTE THAT THE SECTION BELOW TITLED DISPUTE RESOLUTION CONTAINS A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER. THEY AFFECT YOUR LEGAL RIGHTS. PLEASE READ THEM."

Because this notice appeared in a scrollable text box that contained the entire 2018 License Agreement, a user could scroll through the agreement to find a section clearly titled "**Dispute Resolution**." Thus, the trial court mistakenly stated in its minute order that "there is no 'Dispute Resolution' section 'below.' " (See *Sellers*, *supra*, 73 Cal.App.5th at p. 462 [Court of Appeal reviews undisputed screenshots de novo].)

The Dispute Resolution section of the 2018 License Agreement, in turn, provided sufficiently conspicuous notice that it incorporated by reference the Dispute Resolution Policy, which contains an arbitration provision. "The general rule is that the terms of an extrinsic document may be incorporated by reference in a contract so long as (1) the reference is clear and unequivocal, (2) the reference is called to the attention of the other party and he consents thereto, and (3) the terms of the incorporated document are known or easily available to the contracting parties." (*DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 713 (*Kaleidescape*); see *Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44, 54 (*Shaw*) ["The contract need not recite that it

27

'incorporates' another document, so long as it 'guide[s] the reader to the incorporated document.' "].)[9]

These criteria are satisfied here. As noted, the 2018 License Agreement's Dispute Resolution section states: "Any and all disputes between you and Blizzard which arise out of this Agreement will be resolved in accordance with the Blizzard Entertainment Dispute Resolution Policy, which is available for your review here." The word "here" is a blue, underlined hyperlink. This section clearly and unequivocally refers to the Dispute Resolution Policy by name and calls it to the parties' attention. (*Shaw*, *supra*, 58 Cal.App.4th at p. 54.) The hyperlink to the Dispute Resolution Policy makes its terms " ' "easily available." ' " (*Ibid*.) And the "clear and unequivocal reference to the extrinsic document and the contemporaneous availability of its terms shows that, at the time of

---

[9]    We do not base our analysis on *In re Holl* (9th Cir. 2019) 925 F.3d 1076, on which Blizzard relies, because that case was decided on a different procedural posture in which the Ninth Circuit "had discretion to deny [a petition for writ of mandate] even if the petitioner demonstrated error." (See *Sellers*, *supra*, 73 Cal.App.5th at p. 483 [declining to follow *In re Holl*].)

contracting, the parties consented to those terms."  (*Kaleidescape, supra*, 176 Cal.App.4th at p. 714.)[10]

It is of no import that the document being incorporated contains an arbitration agreement.  (See *Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 914 [the defendant "was under no obligation to highlight the arbitration clause of its contract, nor was it required to specifically call that clause to [the plaintiff]'s attention.  Any state law imposing such an obligation would be preempted by the FAA."]; *Wolschlager v. Fidelity National Title Ins. Co.* (2003) 111 Cal.App.4th 784, 791 ["There is no authority requiring the defendant to specify that the incorporated document contains an arbitration clause in order to make the incorporation valid.  All that is required is that the incorporation be clear and unequivocal and that the plaintiff can easily locate the incorporated document."]; *Ajzenman, supra*, 492 F.Supp.3d at p. 1077 ["there is no special rule that an offeror of an

---

10    The cases on which Plaintiffs rely to defeat incorporation by reference are distinguishable in one or more material ways.  (See *Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1331 ["truncated, vague, and obtuse references . . . were insufficient to clearly and unequivocally evidence an intent" to incorporate contract terms in the highly regulated insurance context]; *Ajzenman, supra*, 492 F.Supp.3d at p. 1078 [no incorporation by reference where the primary contract "incorporated terms from numerous third-party websites without notifying users if such terms even existed or where they could be found"]; *McGhee v. North American Bancard, LLC* (9th Cir. 2019) 755 Fed.Appx. 718, 719 [four-paragraph memorandum decision finding "Terms of Use" did not incorporate by reference a "User Agreement" with an arbitration agreement, where the underlying unpublished district court decision shows the Terms of Use also contained a confusingly conflicting federal court forum selection clause and a merger clause that appeared to exclude the User Agreement (see *McGhee v. North American Bancard, LLC* (S.D. Cal., July 21, 2017, No. 17-CV-0586-AJB-KSC) 2017 WL 3118799, at pp. *3-*4)].)

adhesive consumer contract specifically highlight or otherwise bring an arbitration clause to the attention of the consumer to render the clause enforceable"].)

Plaintiffs imply that Blizzard's incorporation by reference was ineffective because the Dispute Resolution Policy was more than "one click" away from Blizzard's textual notice; that is, the user would have to click a hyperlink to a first webpage that contains the License Agreement, and from there click a hyperlink to a second webpage that contains the Dispute Resolution Policy. (See, e.g., *Sellers*, *supra*, 73 Cal.App.5th at pp. 483-484 [finding notice insufficient where "the terms are available only if the consumer scrolls through the disclaimers and clicks on a *secondary link* to the terms of service" (italics added)].) However, this ignores that the 2018 pop-up notice presented the entire 2018 License Agreement, which contained a hyperlink directly to the Dispute Resolution Policy. Thus, the incorporated document was only *one* click away, not *two*.

The notice Blizzard provided to Plaintiffs does not suffer from the same infirmities as the notice provided by the defendant in *Sellers*. Blizzard's notice is not subject to the ARL's specific conspicuousness criteria. (See *Sellers*, *supra*, 73 Cal.App.5th at p. 479.) Blizzard's notice was not in "extremely small print," lacking contrast, or "outside the [area] where the consumer's attention would necessarily be focused." (*Id.* at p. 481.) And Blizzard's notice did not rely on a visually nondescript hyperlink—*no* hyperlink was required to access the 2018 License Agreement (because the entire agreement was contained in the pop-up), and the hyperlink in the Dispute Resolution section stood out in underlined blue text. (See *ibid.* ["the hyperlink . . . is underlined, but it is not set apart in any other way that may

draw the attention of the consumer, such as with blue text or capital letters"].)

To conclude, the 2018 pop-up notice provided sufficiently conspicuous notice that by clicking on the "Continue" button at the bottom of the pop-up, the user would be agreeing to all of the terms of the 2018 License Agreement, which validly incorporated by reference the Dispute Resolution Policy, together with its arbitration agreement and class action waiver (both of which the pop-up notice specifically brought to the user's attention).

## II. The *McGill* Rule

Alternatively, Plaintiffs contend that if we conclude (as we have) that the parties entered into an arbitration agreement, we may still affirm the trial court's order on the alternate ground (not reached by the trial court) that the arbitration agreement is nevertheless unenforceable because it precludes Plaintiffs from pursuing public injunctive relief in all fora, in violation of the *McGill* rule. (See *McGill*, *supra*, 2 Cal.5th at p. 962 ["a provision in *any* contract . . . that purports to waive, in all fora, the statutory right to seek public injunctive relief under the UCL . . . is invalid and unenforceable under California law"].) Specifically, Plaintiffs contend they are seeking a public (rather than private) injunction; the arbitration provision precludes them from seeking it in court; and the class and collective action waiver precludes them from seeking it in arbitration. Thus, Plaintiffs maintain the Dispute Resolution Policy precludes them from seeking a public injunction "in all fora." (*McGill*, at p. 962.)

Blizzard counters that the arbitration agreement contains a "delegation clause" that delegates to the arbitrator—not the courts—the resolution of a *McGill* rule challenge. Alternatively, Blizzard maintains the challenge fails on its merits.

31

As we will explain, we agree with Blizzard that the parties agreed to delegate to the arbitrator the resolution of gateway issues, such as a *McGill* rule challenge (including whether Plaintiffs seek a public or private injunction, and, if public, whether the Dispute Resolution Policy prevents them from seeking it in all fora).

## A. *Background*

### 1. Dispute Resolution Policy Provisions

We begin by setting forth the provisions of the Dispute Resolution Policy relevant to Plaintiffs' challenge.

A section titled "BINDING ARBITRATION" provides: "If a Dispute cannot be resolved through negotiations," either party "may elect to have the Dispute . . . finally and exclusively resolved by binding arbitration," which "election . . . shall be final and binding on the other" party. "The arbitration shall be commenced and conducted by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures, which are available at the JAMS website ([hyperlink provided])."

The arbitration provision specifies that it does not apply to three classes of claims, identified elsewhere in the Dispute Resolution Policy as: (1) disputes regarding Blizzard's intellectual property rights; (2) "claims that the other party has committed piracy, or tortious interference"; and (3) "any claim within the jurisdictional limits of the small claims courts."

The arbitration provision also includes a delegation clause that provides in part: "The arbitrator shall determine the scope and enforceability of this arbitration agreement, including whether a Dispute is subject to arbitration. The arbitrator has authority to decide all issues of arbitrability, including where a party raises as a defense to arbitration that the claims in question" fall within one of the three carved-out categories noted above.

32

Finally, the Dispute Resolution Policy include a section titled "CLASS AND COLLECTIVE ACTION WAIVER," which provides in part:

> "You and Blizzard agree that any arbitration or court proceeding shall be limited to the Dispute between Blizzard and you individually. YOU ACKNOWLEDGE AND AGREE THAT:

> "A CLAIM BY, OR ON BEHALF OF, OTHER PERSONS, WILL NOT BE CONSIDERED IN, JOINED WITH, OR CONSOLIDATED WITH, THE ARBITRATION PROCEEDINGS OR ANY COURT PROCEEDINGS BETWEEN YOU AND BLIZZARD;

> "THERE IS NO RIGHT OR AUTHORITY FOR ANY DISPUTE TO BE ARBITRATED, ADJUDICATED, OR RESOLVED THROUGH COURT PROCEEDINGS ON A CLASS-ACTION BASIS OR TO UTILIZE CLASS ACTION PROCEDURES; AND

> "YOU WILL NOT HAVE THE RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE, PRIVATE ATTORNEY GENERAL, OR AS A MEMBER OF ANY CLASS OF CLAIMANTS FOR ANY DISPUTE SUBJECT TO ARBITRATION OR ANY DISPUTE BROUGHT IN COURT.

> "Any Dispute regarding the prohibitions in the prior sections shall be resolved by the arbitrator in accordance with this Agreement. If, for any reason, this class or collective action waiver is deemed unenforceable by a court or arbitrator, you agree that the parties' contract to arbitrate is then void, and any ongoing or future Dispute will be submitted to a court of competent jurisdiction within [Orange County]."

### 2. Trial Court Proceedings

Blizzard argued in its motion to compel arbitration that "any challenges to the enforceability of the [a]rbitration [p]rovision or questions

33

about scope, are for the arbitrator" to decide under the delegation clause.[11] Blizzard also cited the fact that the governing JAMS rules also "assign to the arbitrator any 'disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought' and gives the arbitrator the authority to 'determine jurisdiction and arbitrability issues as a preliminary matter.' (See JAMS Comprehensive Arbitration Rule 11(b).)"

Plaintiffs argued in opposition that if any arbitration agreement was formed, it violated the *McGill* rule. However, Plaintiffs did not address Blizzard's delegation argument.

The trial court denied Blizzard's motion to compel on the ground the parties did not form an agreement to arbitrate. The court did not reach Plaintiffs' *McGill* argument or Blizzard's delegation argument.

### B. *Legal Principles*

"There is no dispute that parties to arbitration agreements are generally free to delegate to an arbitrator, instead of a court, questions regarding the enforceability of their agreement." (*Smythe v. Uber Technologies, Inc.* (2018) 24 Cal.App.5th 327, 332; see *Henry Schein, Inc. v. Archer and White Sales, Inc.* (2019) __U.S.__ [139 S.Ct. 524, 529] ["parties may agree to have an arbitrator decide not only the merits of a particular dispute but also ' "gateway" questions of "arbitrability" ' "]; *Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233, 243; *Aanderud v. Superior Court* (2017) 13 Cal.App.5th 880, 891 (*Aanderud*).) " '[J]ust as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute [citations], so the question "who has the primary power to decide

---

[11] Plaintiffs' appellate counsel mistakenly asserted at oral argument that Blizzard did not raise the delegation issue in the trial court.

34

arbitrability" turns upon what the parties agreed about *that* matter.' " (*Sandquist*, at p. 243.)

" There are two prerequisites for a delegation clause to be effective. First, the language of the clause must be clear and unmistakable. [Citation.] Second, the delegation must not be revocable under state contract defenses such as fraud, duress, or unconscionability.' [Citations.] The 'clear and unmistakable' test reflects a '*heightened* standard of proof' that reverses the typical presumption in favor of the arbitration of disputes." (*Aanderud*, *supra*, 13 Cal.App.5th at p. 892.)

### C. *Analysis*

We conclude Plaintiffs' *McGill* challenge falls within the scope of gateway issues the parties agreed to delegate to the arbitrator.

The Dispute Resolution Policy clearly and unmistakably states in several places that questions regarding enforceability are delegated to the arbitrator. The arbitration provision states that "[t]he arbitrator shall determine the scope and enforceability of this arbitration agreement." It also states that "[t]he arbitrator has authority to decide all issues of arbitrability." Finally, the class and collective action waiver provision—which forms the basis of Plaintiffs' *McGill* challenge—similarly states that "[a]ny Dispute regarding the prohibitions [specified in that provision] shall be resolved by the arbitrator in accordance with this Agreement." These delegations are sufficiently clear and unmistakable. (See *Aanderud*, *supra*, 13 Cal.App.5th at p. 892 [provision stating "the parties 'agree to arbitrate all disputes . . . arising out of or relating to . . . the interpretation, validity, or enforceability of this Agreement, including the determination of the scope or applicability of [the arbitration] section' " constitutes "clear and unmistakable evidence that the parties intended to arbitrate arbitrability"].)

Additionally, the arbitration provision's "reference to the JAMS Rules further evidences the parties' clear and unmistakable intent to submit issues of arbitrability to the arbitrator." (*Aanderud, supra*, 13 Cal.App.5th at p. 893; see *Greenspan v. LADT, LLC* (2010) 185 Cal.App.4th 1413, 1442 [" 'when . . . parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator' "]; *Ramirez v. Electronic Arts Inc.* (N.D.Cal., Mar. 5, 2021, No. 20-CV-05672-BLF) 2021 WL 843184, at p. *4 (*Ramirez*) [incorporation of AAA rules that "provide that disputes regarding the validity of an arbitration agreement are also delegated to the arbitrator, rather than the Court, to decide" "constitutes clear and unmistakable delegation of intermediate issues of arbitrability to the arbitrator"].)

Although the Dispute Resolution Policy does contain some references to occasions on which a court (rather than an arbitrator) might interpret the policy,[12] the *Aanderud* court explained that such references do not undermine an otherwise clear and unmistakable delegation of gateway issues to an arbitrator when the arbitration agreement contemplates that some claims will be arbitrated and others will be litigated in court. (*Aanderud, supra*, 13 Cal.App.5th at p. 886 [delegation to the arbitrator was still clear and unmistakable despite references to a "court" when the agreement required the parties to "resolve any Dispute . . . through binding arbitration

---

12 For example, the class and collective action waiver provision addresses circumstances in which "this class or collective action waiver is deemed unenforceable by a court or arbitrator . . . ." And a section titled "RULES OF CONSTRUCTION" provides that "[a] court shall construe the agreement to arbitrate and the agreement to waive class or collective actions in any manner that will render them enforceable and give them effect."

*or small claims court*" (italics added)]; see *id.* at p. 894, fn. 3 [distinguishing cases where the arbitration "agreements involved instances of actual ambiguity and *none provided for small claims court jurisdiction*" (italics added)]; *Bell v. Redfin Corporation* (S.D.Cal., Aug. 12, 2021, No. 20-CV-2264-AJB-AGS) 2021 WL 5444791, at p. *4 ["Because [the arbitration] provision contemplates the possibility of some court involvement [e.g., to enter a judgment enforcing an arbitral award], the Court cannot conclude that the severability clause's reference to court decisions renders the delegation clause ambiguous or contradictory."]; *Baker v. Osborne Development Corp* (2008) 159 Cal.App.4th 884, 893 [no clear and unmistakable delegation where "one provision of the arbitration agreement stated that issues of enforceability or voidability were to be decided by the arbitrator, another provision indicated that the court might find a provision unenforceable," but the agreement did not contemplate that some claims would be brought in court]; *Najarro v. Superior Court* (2021) 70 Cal.App.5th 871, 880 [finding no clear and unmistakable delegation of class/group/representative action issues to the arbitrator where the severability clause in one version of the arbitration agreement provided for resolution of issues by "the arbitrator *or any judge of competent jurisdiction*" but expressly carved out claims "in relation to class, group, or representative actions"; another version without the carve-out was a valid delegation].)

Here, the arbitration provision expressly carves out three classes of claims that remain subject to litigation in court.  Thus, the fact the Dispute Resolution Policy contemplates that courts may, on occasion, be called upon to construe various provisions of the policy does not undermine the policy's otherwise clear and unmistakable delegation of gateway issues to the arbitrator on claims subject to arbitration.

Having concluded the parties clearly and unmistakably intended that the issue of arbitrability be determined by the arbitrator, we turn to the second prong of the delegation analysis—whether the delegation clause is otherwise "revocable under state contract defenses such as fraud, duress, or unconscionability." (*Aanderud, supra,* 13 Cal.App.5th at p. 892; see *id.* at p. 895 [defense "must be specific to the delegation clause"].) "The party opposing arbitration has the burden of proving" such a defense. (*Id.* at p. 895.)

Plaintiffs have not met this burden. Despite the fact Blizzard raised the delegation issue in the trial court, Plaintiffs have never addressed it. And other than claiming no arbitration agreement was formed—a claim we have rejected—Plaintiffs' only other defense to the arbitration agreement is that the class and collective action waiver provision violates the *McGill* rule. But this challenge is not "specific to the delegation clause." (*Aanderud, supra,* 13 Cal.App.5th at p. 895.)

Moreover, courts routinely hold that the resolution of a *McGill* rule challenge is a gateway issue subject to delegation under a clause like the one here. (See *Aanderud, supra,* 13 Cal.App.5th at p. 897 [concluding "it is the arbitrator who will consider . . . whether the [class waiver] provision purports to waive the [plaintiffs'] right to seek public injunctive relief in all fora and, if so, what impact this has on the enforceability of the arbitration provision as a whole"]; *Wilson v. Wells Fargo & Co.* (S.D.Cal., May 10, 2021, No. 20-CV-2307-DMS-WVG) 2021 WL 1853587, at *4 ["Where, as here, the parties have delegated arbitrability to the arbitrator, the application of *McGill* is a question for the arbitrator, not the Court, to decide.' "]; *Ramirez, supra,* 2021 WL 843184, at p. *4 [a challenge under the *McGill* rule "is clearly a matter

regarding the validity of the Arbitration Provision . . . that is plainly delegated to an arbitrator"].)[13]

DISPOSITION

We reverse the trial court's December 18, 2020 order and direct the court to enter a new order granting Blizzard's motion to compel arbitration. Blizzard is entitled to its costs on appeal.

HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


IRION, J.

---

[13]    Plaintiffs' appellate counsel conceded at oral argument that if the delegation clause is enforceable, it applies to Plaintiffs' *McGill* rule challenge and the issue must be decided by the arbitrator.

The Blizzard End User License Agreement has changed:

# Blizzard End User License Agreement

LAST REVISED June 1, 2018

IMPORTANT NOTICE:

THIS VERSION OF THE BLIZZARD END USER LICENSE AGREEMENT WILL BECOME EFFECTIVE ON June 21, 2018.

YOU SHOULD CAREFULLY READ THIS AGREEMENT (THE "AGREEMENT") BEFORE INSTALLING OR USING BLIZZARD'S ONLINE GAMING PLATFORM. IF YOU DO NOT AGREE WITH ALL OF THE TERMS OF THIS AGREEMENT, YOU MAY NOT INSTALL OR OTHERWISE ACCESS THE PLATFORM.

Thank you for your interest in Blizzard's online gaming services and interactive games, and the interactive games from other developers ("Licensors") who make their games available through Blizzard's Platform. (Blizzard's and the Licensors' games are collectively referred to herein as the "Games"). This Agreement sets forth the terms and conditions under which you are licensed to install and use the Platform. As used herein, the term "Platform" refers collectively, and at times individually, to (1) the Blizzard Battle.net App software, (2) the Blizzard Battle.net gaming services, (3) each of the Games, (4) authorized Mobile Apps relating to the Games and the Blizzard Battle.net service, and (5) all features and components of each of them, whether installed or used on a computer or mobile device. IF YOU DO NOT AGREE TO THE TERMS OF THIS AGREEMENT, YOU ARE NOT PERMITTED TO INSTALL, COPY, OR USE THE BLIZZARD PLATFORM. IF YOU REJECT THE TERMS OF THIS AGREEMENT WITHIN FOURTEEN (14) DAYS AFTER YOUR PURCHASE OF A GAME FROM BLIZZARD, YOU MAY CONTACT BLIZZARD THROUGH https://us.bottle.net/support/en/ TO INQUIRE ABOUT A FULL REFUND OF THE PURCHASE PRICE OF THAT GAME. IF YOU PURCHASED A GAME AT RETAIL, YOUR RIGHT TO RETURN THE GAME IS SUBJECT TO THE RETAILER'S RETURN POLICY.

PLEASE NOTE THAT THE SECTION BELOW TITLED DISPUTE RESOLUTION CONTAINS A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER. THEY AFFECT YOUR LEGAL RIGHTS. PLEASE READ THEM.

Except as otherwise provided below, if you reside in the United States, Canada, or Mexico, use of the Platform is licensed to you by Blizzard Entertainment, Inc., a Delaware corporation, 1 Blizzard Way, Irvine, CA 92618, and if you are not a resident of the United States, Canada, or Mexico, use of the Platform is licensed to you by Activision Blizzard

By clicking "Continue", I acknowledge that I have read and understood the Blizzard End User License Agreement applicable to my country of residence.

Continue | Cancel

**APPENDIX A**

40